UNITED STATES of America,

v.

Xavier WILLIAMS, a/k/a "Xavier Torres", a/k/a "X," a/k/a "Richie Torres," Elijah Bobby Williams, a/k/a "Bobby Torres," a/k/a "Bosco," Michael Williams, a/k/a "David Michael Torres," a/k/a "Mike Torres," a/k/a "Mike Foster," Kelly Rolon a/k/a "Alexus Quinones," Defendants.

No. 00 CR. 1008(NRB).

United States District Court,
S.D. New York.

Dec. 18, 2001.

---

Nicole LeBarbara, Esq., Assistant United States Attorney, New York City, for the United States.

Michael Young, Esq., New York City, Harry J. Trainor Jr., Esq., Knight, Manzi, Nussbaum & LaPlaca, P.A., Upper Malboro, MD, for Xavier Williams.

Jonathan Marks, Esq., New York City, David A. Ruhnke, Esq., Montclair, NJ, for Elijah Bobby Williams.

Richard B. Lind, Esq., New York City, Cathy L. Waldor, Esq., Waldor & Carlesimo, West Orange, NJ, for Michael Williams.

Robert M. Baum, Esq., Federal Defender Office, New York City, for Kelly Rolon.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

The four defendants in this case were indicted on September 26, 2000 on multiple counts, including, *inter alia,* narcotics trafficking, racketeering, and murder. The Government alleges that they were all members of a criminal enterprise referred to in the Indictment as the "Torres Organization."[1]

Before the Court are numerous pre-trial motions by the defendants. On October 16–17 and 30–31, 2001, and on November 1, 2001, the Court held evidentiary hearings in regard to several of these motions. The Court heard testimony from Detectives James Cvetic and Gary Tallant of the Allegheny County Police Department as well as from Special Agent Robert Ryan of the Internal Revenue Service. No defendant testified at these hearings, nor did any defendant call any witnesses. The findings of fact herein are based upon the testimony adduced at these hearings and

---

1. Xavier and Elijah Bobby Williams's mother's maiden name is Torres, and the Williams defendants, apparently, often use that surname.

we dispose of the defendants' motions[2] as follows:

 A. Michael and Xavier Williams's motions to suppress evidence seized from their apartments at 5631 Rippey Street in Pittsburgh on or about February 21, 1996 are *denied.*

 B. Xavier Williams's motions to suppress evidence seized from his Toyota Land Cruiser and his person on or about March 1, 1996 are *denied.*

 C. Xavier Williams's motions to suppress evidence seized from his apartment at 1609 East 174th Street in the Bronx and from his Nissan Maxima on or about September 28, 2000 are *denied.*

 D. Xavier Williams's motion to suppress evidence seized from his Lincoln Navigator on or about November 2, 2000 is *denied.*

 E. Michael Williams's motion to suppress a post-arrest statement he made on March 22, 1996 is *granted.*

 F. Elijah Bobby Williams's motion to suppress a post-arrest statement he made on April 21, 1996 is *denied.*

 G. Michael Williams's motion to dismiss Counts Five, Six, and Seven of the Indictment is *denied.*

 H. Xavier Williams's motion to dismiss Count Three and Racketeering Act 1 of Count One of the Indictment is *denied.*

 I. Xavier and Michael Williams's motions to compel the Government to provide the defendants with a bill of particulars is *denied.*

 J. Xavier and Michael Williams's motions to compel certain discovery is *denied in part and granted in part.*

 K. Xavier Williams's motion to hold government prosecutors in contempt is *denied.*

 L. Xavier Williams's motion for an order mandating the return of certain items seized from him is *denied.*

 M. Michael Williams's motion for severance is *denied.*

 N. Kelly Rolon's motion for severance is *granted.*

## I. BACKGROUND

The defendants are accused of being members of a narcotics trafficking organization responsible for various acts of violence, including murder. Indictment at 3. Xavier Williams and Elijah Bobby Williams are brothers, and Michael Williams is Elijah Bobby Williams's son.[3] Kelly Rolon is Xavier Williams's wife. A lengthy investigation conducted primarily by the New York Police Department ("NYPD") and the Bureau of Alcohol, Tobacco & Firearms ("ATF") led to a grand jury returning a 17–count indictment. Because the Williams defendants are accused, in Counts Five, Six, and Seven, of crimes for which the death penalty may be sought, each has been appointed two attorneys, one of whom is "learned in the law applicable to capital cases" in accordance with 18 U.S.C. § 3005.

## II. DISCUSSION

### A. Motions to Suppress the Fruits of the Searches of the Rippey Street Apartments

In connection with their investigation of the triple homicide of February 18, 1996,

---

**2.** Both Michael and Xavier Williams joined the motions of their codefendants to the extent applicable. For the sake of clarity, however, we refer only to the defendant who briefed a motion when discussing it herein.

**3.** Throughout this opinion, we refer to Xavier Williams, Elijah Bobby Williams, and Michael Williams collectively as the "Williams defendants."

the Allegheny County Police Department obtained and executed a search warrant for three apartments located near the scene of the shootings. These apartments were leased by the Williams defendants, and the search produced narcotics, firearms, and other evidence which the Government presumably intends to introduce at trial. Transcript of Suppression Hearing held November 1, 2001 ("11/1 Tr.") at 3; Gov't Opp. at 5. Defendants Xavier Williams and Michael Williams move to suppress the fruits of the searches of apartments B–3 and C–2, respectively, at 5361 Rippey Street in Pittsburgh (the "Rippey Street apartments"). Xavier Williams's Memorandum of Law ("X.W.Mem.") at 1; Michael Williams's Memorandum of Law ("M.W.Mem.") at 3. Elijah Bobby Williams has not moved to suppress the fruits of the search of apartment C–5.

### 1. Facts

On February 21, 1996, Detective Tallant drafted an affidavit (the "Tallant affidavit") in support of an application for a warrant to search the Rippey Street apartments. 11/1 Tr. at 6–7.[4] He did not consult any prosecutors from the District Attorney's Office or anywhere else for drafting assistance. *Id.* at 9. Det. Cvetic reviewed the affidavit, and then they both swore to it before a night court magistrate. *Id.* at 21–22. The Tallant affidavit reads as follows:

> Your affiants are Detectives assigned to the Homicide Unit of the Allegheny County Police Department. All of the information contained in this affidavit was learned directly by your affiants, or relayed to your affiants by other police officers involved in this investigation.

On the evening of February 18, 1996, the Wilkinsburg Police Department requested investigative assistance from the Allegheny County Police Homicide Unit. This request was in regards [sic] to a recent shooting incident that occurred in the 1100 block of Sperling Street in Wilkinsburg. It was subsequently learned that there were three (3) victims in this case, and all of the shooting victims were pronounced dead at the scene by Emergency Medical Personnel. The victims were all shot while seated in a parked 1982 Ford Bronco. The victims were Timothy A. Moore, B/M/25, Joel MOORE, B/M/19, and Robert JAMES, B/M/33. The investigation revealed that two armed suspects approached the victim's vehicle, and that the suspects then fired numerous gunshots into the victim's [sic].

During the course of this investigation, it was learned that the three victims were involved in drug related activities. It was also learned that the victims had made a recent drug deal(s) with individuals known to frequent the Wilkinsburg/East Liberty Section of Allegheny County.

Numerous interviews have been conducted in this case. The identity of these witnesses is known to your affiants. These witnesses will be available to testify at any necessary court proceedings. It was collectively learned through these witnesses that several days prior to the shooting incident, Timothy MOORE (victim), made a crack cocaine drug deal with individuals that he knew as "BOB" and "MIKE". Bob and Mike previously indicated that they were brothers, and they were from New

---

**4.** Det. Tallant actually drafted three separate affidavits, one for each Rippey Street apartment. These documents are, however, identical with the lone exception of the apartment number. Therefore, we will treat them as if they were a single affidavit and we will treat the three search warrants it led to as if they were a single search warrant.

York. It was learned that the drug deals in question were set up through the use of telephone pagers. The telephone pager numbers for Bob and Mike were # 574–5647 and # 574–1745 respectively.

It was learned that during the investigation that "Bob" had a home telephone number of # 661–4862. This telephone number is listed to a David Michael TORRES of 5631 Rippey Street, Apt. C–2, Pittsburgh, PA 15206. This apartment is located in the East Liberty Section of Pittsburgh. The age of Torres is consistent with the approx. age of "Bob" (as given by various witnesses).

The investigation revealed that on the evening in question, the victims agreed to meet with BOB and MIKE in Wilkinsburg to settle a drug related debt. It was reported that Tim MOORE had previously paid Bob and/or Mike approx. $2,300 for crack cocaine, but that Moore was not given any drugs in return for the money. The victims were to meet Bob and Mike at approx. 8:30 PM (2–18–96) in a parking lot of a Texaco Gas Station in Wilkinsburg. The purpose of the meeting was to resolve the dispute over the aforementioned crack cocaine deal. Witnesses indicated that the victim's departed from the New Stanton area of Westmoreland County for Wilkinsburg at approx. 8:00 PM. It should be noted that the planned meeting place for the drug deal was in close proximity to the shooting scene.

During the investigation, your affiant learned through witnesses that the suspects, (BOB/MIKE) lived in the area of Rippey Street in the East Liberty Section of Pittsburgh. It was also learned that Bob and Mike lived with a relative known as "X". The investigation revealed that David MICHAEL TORRES resides at 5631 Rippey Street, Apt. C–2 and that two relatives lived at that same address. These relatives are Robert TORRES, AKA "BOB" Torres, and Xavier TORRES. Robert Torres lives in apartment # C–5, while Xavier resides in apartment B–3.

During a recent surveillance of the apartment building in question, a vehicle was found to be parked in front of the structure. This vehicle had a New York license plates [sic] affixed to it. The description of this car was consistent with the description of the suspect car that was observed fleeing the shooting scene.

Based on the above facts and circumstances, your affiants respectfully request a Search Warrant for the above listed residence.

The warrant was subsequently issued by the night court magistrate and executed by state officers the same day. *Id.* at 7.

Following the search, Michael Williams and Xavier Williams were arrested and charged in Pennsylvania state court with homicide and drug possession, respectively. *See Commonwealth v. Torres*, 564 Pa. 86, 764 A.2d 532, 536 (2001); X.W. Mem. at 1. Michael Williams filed a pre-trial motion in state court seeking, *inter alia*, suppression of the fruits of the search of his Rippey Street apartment. *Torres*, 764 A.2d at 536. The state court granted his motion, on the grounds that the search warrant was deficient because (a) it failed to establish probable cause to search the apartment; (b) it failed to establish the reliability of the sources of the information on which it was based; and (c) it failed to establish the time frame within which the information was obtained. *See Commonwealth v. Torres*, 714 A.2d 416, 419 (1998). Following this suppression order, the Commonwealth moved to "*nolle prosse*," or abandon, its case against Xavier Williams, and the court entered an order to that effect. *Commonwealth v. Williams*, cc

9700236 (Order of Court dated Dec. 1, 1997). The suppression order was overturned by an intermediate state appellate court, *Torres,* 714 A.2d at 421, but was eventually affirmed by the Supreme Court of Pennsylvania.[5] *Torres,* 764 A.2d at 540.

### 2. Analysis

#### a. Applicability of the Exclusionary Rule

■ The Government argues that the exclusionary rule should not be applied to the searches of the Rippey Street apartments because the search was conducted by agents of the State of Pennsylvania without any assistance from the federal agencies involved in obtaining the present indictment. Gov't Opp. at 5–10. Specifically, the Government contends that because the goal of the exclusionary rule is to deter official misconduct, and because this prosecution is so far removed from the search at issue, when we balance the " 'additional marginal deterrence' obtained by invoking the [exclusionary] rule 'against the cost to the public interest of further impairing the pursuit of truth' " we should decline to invoke the exclusionary rule. *Id.* at 6 (quoting *Tirado v. Commissioner,* 689 F.2d 307, 310 (2d Cir.1982)).

We do not, however, have discretion in the matter. In *Elkins v. United States,* the Supreme Court rejected the argument put forth by the Government and held that "evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial." 364 U.S. 206, 223, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). The *Elkins* rule remains the law. *See, e.g., Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001); *United States v. Jones,* 185 F.3d 459, 463 (5th Cir.1999) ("The question that a federal court must ask when state officials secure evidence to be used against a defendant accused of a federal offense is whether the actions of the state officials violated the Fourth Amendment of the United States Constitution.") (internal quotation omitted). It is clear, then, that the exclusionary rule does apply to the searches at issue here. Indeed, any other result would be fraught with mischievous potential.

#### b. Probable Cause

■ In *Commonwealth v. Torres,* the Supreme Court of Pennsylvania carefully considered the issue of whether the Tallant affidavit stated probable cause. We agree with its conclusion that, on its face, the Tallant affidavit did not satisfy the probable cause requirement of the Fourth Amendment as articulated in *Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).[6] Specifically,

**5.** The Pennsylvania Supreme Court did, however, uphold the reversal of the suppression order with respect to Elijah Bobby Williams's apartment solely because he lacked standing to challenge the search. *Torres,* 764 A.2d at 541–43. As Elijah Bobby Williams did not move to suppress the evidence seized from "his" Rippey Street apartment, we do not consider this issue.

**6.** In *Gates,* the United States Supreme Court stated:

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis

we agree that the failure of the affidavit to (a) set forth the basis of knowledge and veracity of the anonymous sources cited therein, (b) provide any indication of which of the anonymous sources provided each piece of information included therein, and (c) provide significant indicia of reliability to overcome these other failures, rendered it insufficient to meet the requirements of the Fourth Amendment. *Torres,* 764 A.2d at 539–40; *see also Gates,* 462 U.S. at 238–39, 103 S.Ct. 2317; *United States v. Canfield,* 212 F.3d 713, 718 (2d Cir.2000); 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 3.3 at 88 (3d ed.1996). In contrast to Pennsylvania's jurisprudence, our analysis does not end here.

### c. Good Faith Exception

■ Unlike Pennsylvania, which does not have a "good faith exception" to the exclusionary rule, *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 899 (1991), the federal courts do recognize such an exception. *United States v. Leon,* 468 U.S. 897, 899, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Therefore, the Government argues that, even if the Rippey Street search warrant was invalid, the good faith exception to the warrant requirement applies to the case at bar. Gov't Opp. at 26. We agree, and for this reason, the evidence seized from the Rippey Street apartments shall not be suppressed for violating the defendants' Fourth Amendment rights.

In *Leon,* the Supreme Court held that the Fourth Amendment does not bar the Government from using "evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause" in its

for ... conclud[ing] that probable cause existed.

case-in-chief. 468 U.S. at 899, 104 S.Ct. 3405. As we have found that the warrant in question was unsupported by probable cause, *see* Section II.A.2.b, *supra,* and the defendants have not argued that the magistrate was anything but detached and neutral, our analysis boils down to the question of whether Detectives Tallant and Cvetic, who swore to the affidavit, and the other officers who executed the warrant, acted in accordance with the standard set forth in *Leon.* This is an objective standard, namely, "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon,* 468 U.S. at 923 n. 23, 104 S.Ct. 3405; *see also id.* at 919 n. 20, 104 S.Ct. 3405.

Here, Det. Tallant not only swore to the affidavit that led to the Rippey Street search warrant, he captained the execution of the warrant that very evening. 11/1 Tr. at 16–18 (Det. Tallant explaining how he led several "teams" of officers in executing the search). Thus, our inquiry focuses on whether a "reasonably well trained officer" who drafted and swore to this affidavit, then led the search pursuant to a warrant supported by the affidavit, would have "known that the search was illegal, despite the magistrate's authorization." *Leon,* 468 U.S. at 923 n. 23, 104 S.Ct. 3405. We find that a reasonably well trained officer in that position would have relied in good faith on the warrant and not known that the search was illegal.

Given the availability of the good faith exception, the November 1, 2001 hearing provided Det. Tallant with an opportunity to fill in many of the gaps that led us to conclude that the warrant was facially defective. *See* Section II.A.2.b, *supra.* Det. Tallant was entirely credible throughout

*Id.* at 238–39, 103 S.Ct. 2317 (some internal alterations omitted).

his testimony, and no other witnesses were called. Once the Court received an accurate picture of what Det. Tallant knew when he swore to the Tallant affidavit and searched the Rippey Street apartments, we were convinced that, had Det. Tallant included in the affidavit all the information he actually knew at the time, we would have found that the ensuing warrant was, in fact, supported by probable cause. In short, we find that while the affidavit was poorly drafted, the ensuing search was conducted in good faith.

Det. Tallant testified that the information in the affidavit was primarily obtained from several sources: Roger Moore, brother of homicide victim Timothy Moore; Tica Carter, Timothy Moore's live-in girlfriend; and an unnamed live-in girlfriend to Robert James. 11/1 Tr. at 58–68. He further testified that he carefully drafted the affidavit so as to prevent the defendants from learning the identities of the witnesses in order to protect them from possible retaliation by the defendants, who would receive a copy of the affidavit at the time of the search. *Id.* at 9–12, 42–44. Thus, Det. Tallant did not put the names of any witnesses in the affidavit. *Id.* at 10. In addition, he gave all the information in a "collective" manner, because a defendant might have been able to identify an unnamed witness by the specific information with which they are credited. *Id.* at 43. While this methodology is the primary reason for the warrant's invalidity, *see* Section II.A.2.b, *supra,* we find that it was done in good faith and that a reasonably well trained officer could believe that, because a magistrate had accepted an affidavit written in this style, it was valid under the Constitution.

Det. Tallant testified as to the basis of knowledge of the sources who provided the information contained in the Tallant affidavit. For our purposes, it will suffice to mention just a few excerpts from Det. Tallant's testimony. He testified that Roger Moore and the victims' girlfriends had personal knowledge of the victims' drug activities. 11/1 Tr. at 58. He testified that the pager numbers listed in the affidavit were obtained from a girlfriend of one of the victims, who had "dialed some of those pager numbers herself." *Id.* at 59. He stated that Roger Moore had spoken to victim Tim Moore on the day of the homicides, and the latter told him that he was going to settle a drug debt of approximately $2,000–$3,000 that night, and that Robert James's girlfriend also told him of the debt-settlement meeting. *Id.* at 63–64. Finally, Det. Tallant testified that one of the girlfriends told him that the defendants lived in the Rippey Street Apartments. *Id.* at 66–67.

Det. Tallant also testified as to the reliability of the witnesses:

> What satisfied me about their reliability is that they related to me things that they knew personally, not things that were told to them by others, that they had conversations with the victims, that they had in fact, in the case of one witness, had actually met [Elijah Bobby Williams] and [Michael Williams] and that they knew about drug transactions because they had witnessed them.

> One witness was even admitting to the fact that this witness was using drugs with them and [ ], in my estimation, was very straightforward because this information put this particular witness in a bad light, explaining that they also had this drug-related lifestyle. I felt that they were very forthcoming with the information. Their concerns to me were not about things that they had done or illegal activities that they were involved with, they were very open about that,

their concerns were safety concerns. So I felt that they were reliable.

*Id.* at 55–56.

Finally, Det. Tallant repeatedly testified that he honestly believed that the warrant was valid. *See, e.g., id.* at 8, 20. As *Leon* announced an objective test, this fact may seem irrelevant. *Leon,* 468 U.S. at 919 n. 20, 923 n. 23, 104 S.Ct. 3405. Nevertheless, the core of the *Leon* test is whether the search was conducted in "good faith." Thus, we would not condone a search that was conducted in pursuant to a warrant which a reasonably well trained officer could rely, but the actual officer who executed the warrant subjectively knew that it failed to state probable cause. *See* La-Fave § 1.3(e) at 68.

In conclusion, we find that Det. Tallant and the other officers who conducted the search of the Rippey Street apartments did so in reasonable reliance on the later-invalidated search warrant, and, therefore, are entitled to the *Leon* "good faith" exception to the exclusionary rule. Accordingly, we do not suppress the fruits of the searches of the Rippey Street apartments for violating defendants' Fourth Amendment rights.

### B. Motions to Suppress the Fruits of the March 1, 1996 Searches

#### 1. Facts

On October 7, 1995, the NYPD received a phone call stating that two men had been shot on 174th Street in the Bronx, New York. Transcript of Suppression Hearing held October 16, 2001 ("10/16 Tr.") at 9. NYPD Detective Robert A. Nugent and Officer Hector Rivera, among others, went to the scene, where Det. Nugent spoke to one of the victims, Victor Mercado. *Id.* at 9, 12. Mercado was badly injured as a result of the shooting, and the police feared that he might die from his injuries. *Id.* at 35, 9. As Mercado was being placed in an ambulance, Det. Nugent asked him for the identity of the perpetrator. *Id.* Mercado replied that "X" had shot him, and when Det. Nugent asked for the identity of "X," Mercado told him that "X" was Xavier Williams. *Id.* at 10.

At the scene of the shooting, Det. Nugent also spoke with the other victim, Jose Vazquez. *Id.* at 27. Vazquez told Det. Nugent that he thought the shooter was a dark-skinned Hispanic man in a hooded sweatshirt. *Id.* at 27–28; Det. Nugent's Investigation Notes at "2305."

Several days later, Det. Nugent again interviewed the victims in the hospital where they was receiving treatment. 10/16 Tr. at 10, 40. Again, Mercado repeated that it was Xavier Williams, whom Mercado claimed to have known since the fifth or sixth grade of grammar school, who had shot him. *Id.* at 10. In addition, he picked out a picture of Xavier Williams from a array of photographs of six men. *Id.* at 39. Det. Nugent also showed Vazquez the same photograph array that was shown to Mercado. *Id.* at 40. Vazquez, however, did not pick anyone out as the perpetrator. *Id.*

In response to these interviews, NYPD officers from Det. Nugent's precinct immediately began searching for Xavier Williams. *Id.* at 11. Det. Nugent also prepared a "wanted card" and "wanted poster" for Xavier Williams, so that if he were stopped by law enforcement officers, they would know that he was wanted by the NYPD in connection with the October 7, 1995 shooting. *Id.*

As part of this investigation, Det. Nugent received information from an unnamed informant. *Id.* at 12. The informant was brought to Det. Nugent by an investigator at the Bronx District Attorney's Office who had used the informant in the past and found him reliable. *Id.* at 40.

The informant told Det. Nugent that Xavier Williams frequently drove a Toyota Land Cruiser with Pennsylvania plates that contained secret compartments where narcotics, weapons, and currency were often stored. *Id.* at 12, 14. Mercado had also told Det. Nugent that Xavier Williams drove, among other vehicles, a Toyota Land Cruiser with a secret compartment. *Id.* at 14. Further, the informant had given Det. Nugent information regarding a sequence of buttons to press in the Toyota in order to open the secret compartment. *Id.* at 13.

On March 1, 1996, shortly after midnight, NYPD Officer Rivera stopped a Toyota Land Cruiser driven by Xavier Williams, who was then arrested by officers of the NYPD. *Id.* at 15. Upon arresting him, the officers searched Xavier Williams and seized certain items from his person. Det. Nugent instructed Officer Rivera not to touch any buttons inside the vehicle, and to have it driven to the precinct and parked there with the engine running. *Id.* at 15. Sergeant Achille of the NYPD drove the vehicle to the precinct, parked it with the engine running, and guarded it until Det. Nugent arrived there, shortly after Xavier Williams was arrested. *Id.* at 16.

Det. Nugent then entered the Toyota and observed that the right rear window was down. *Id.* Following the informant's instructions, he raised that window, and then pressed the button for the left rear window. *Id.* at 13, 16. This caused the center console to "pop[ ] open." *Id.* at 16. Using a flashlight, Det. Nugent looked into the compartment and saw several pieces of identification, credit cards, a piece of paper with a phone number written on it, and a handgun. *Id.* at 16–17. Det. Nugent seized these items. *Id.* at 17. Xavier Williams seeks to suppress all evidence seized that night from his person and the Toyota.

### 2. Analysis

Neither the search of Xavier Williams himself, nor the initial search [7] of the Toyota were executed with a warrant. Thus, they are presumptively unconstitutional. *See, e.g., Maryland v. Dyson,* 527 U.S. 465, 466–67, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999). Nevertheless, for the reasons that follow, we find these searches constitutionally permissible and their fruits untainted.

### a. Search of Xavier Williams

As to the search of Xavier Williams himself, the government asserts that, because the search occurred contemporaneously with a lawful custodial arrest, the fruits should not be excluded because it was a search incident to a valid arrest. *See, e.g., New York v. Belton,* 453 U.S. 454, 461, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). Under this doctrine, the validity of the search is wholly dependant on the legality of the

---

7. Approximately three hours after the search of the Toyota described above, Xavier Williams signed a written consent permitting Det. Nugent to search the vehicle. Gov't Exhibits, Ex. D at 4. A search warrant to search the vehicle was subsequently issued by a New York Criminal Court Judge. *Id.* at 5. The only challenge Xavier Williams makes to the fruits of the search conducted pursuant to this warrant and consent is that these were both "tainted fruit" of Det. Nugent's initial search because, he asserts, they were secured on the basis of the items seized in the initial search. Xavier Williams's Reply Memorandum of Law ("X.W.Reply") at 14–15. Our finding that Det. Nugent's initial search was constitutional obviates these arguments. Thus, we expressly find that none of the further searches of the Toyota, conducted pursuant to either or both of the search warrant or Xavier Williams's consent, violated Xavier Williams's Fourth Amendment rights. For the sake of clarity, we refer hereinafter to the initial, warrantless, search of the Toyota as "the search" of the Toyota.

prior arrest. *See, e.g., Michigan v. DeFillippo,* 443 U.S. 31, 35, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *McCardle v. Haddad,* 131 F.3d 43, 49 (2d Cir.1997). As the arresting officers lacked a warrant to arrest Xavier Williams, the constitutionality of the search of his person depends on whether the arresting officers had probable cause to arrest him when they did. *See, e.g., Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

■ Arrest pursuant to probable cause "requires the arresting officer to have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief than an offense has been committed by the person to be arrested." *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (quotation marks and citations omitted). For the following reasons, we find that Officer Rivera did, in fact, have probable cause to arrest Xavier Williams that night.

■ Officer Rivera was at the scene of the shooting when Mercado told Det. Nugent that he knew Xavier Williams for many years, and that it was he who shot him. Whether Officer Rivera overheard Mercado make this accusation or whether Det. Nugent told Officer Rivera of it is unclear from the testimony, but it is plain that Officer Rivera became aware of Mercado's statements at some time before he arrested Xavier Williams. In addition, Officer Rivera was likely aware of the "wanted card" and "wanted poster" prepared by Det. Nugent for the very purpose of informing other officers that Xavier Williams should be arrested on sight.

■ "[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from . . . the putative victim." *Miloslavsky v.*

*AES Eng'g Soc'y,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd,* 993 F.2d 1534 (2d Cir.1993), *cert. denied* 510 U.S. 817, 114 S.Ct. 68, 126 L.Ed.2d 37 (1993). Statements made by a witness to or victim of a crime are presumed to be truthful when giving information to police about that crime. *United States v. Rowell,* 903 F.2d 899, 903 (2d Cir.1990) (a witness to a crime "need *not* be shown to have been previously reliable before the authorities may rely on his statements") (citation and quotation marks omitted) (emphasis in original). In any event, it was reasonable for Officer Rivera to believe that Mercado was telling the truth for several reasons. First, Mercado gave the same information on two separate occasions, at the scene of the shooting and again at the hospital. Second, many of his statements were corroborated by the unnamed informant as well as Officer Rivera's own observations, such as the fact that Xavier Williams did, in fact, drive a Toyota Land Cruiser. Finally, Mercado's initial statement at the scene was made when it seemed that he might expire at any moment. The law has long deemed statements made in such a situation to be of exceptional trustworthiness. *See* Fed.R.Evid. 804(b)(2) (hearsay exception for statement made "under belief of impending death").

Therefore, Officer Rivera's knowledge of Mercado's credible statements implicating Xavier Williams gave Officer Rivera the probable cause needed to effect a constitutional warrantless arrest of Xavier Williams. The fact that Vazquez did not identify Xavier Williams as the shooter but, rather, thought it was a Hispanic man who had shot him (Xavier Williams is an African–American) does not change the analysis. Mercado was a long-time acquaintance of Xavier Williams, while Vazquez did not know him. Furthermore, it should be recalled that the shooting occurred at night and that Vazquez was

being fired upon at the moment he saw his assailant. It is entirely reasonable, in such a situation, for Det. Nugent and Officer Rivera to determine that Mercado's statement was closer to the truth than Vazquez's statement and that, therefore, Xavier Williams was likely the shooter.[8]

■ "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 148, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Rather, all the Government must show here is that an "objectively reasonable police officer" who knew the "historical facts" which were known to Officer Rivera when he arrested Xavier Williams, would have had probable cause to believe that Xavier Williams had shot Mercado. *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134

L.Ed.2d 911 (1996). They have met this burden and shown that the arrest was lawful. As the constitutionality of the search is solely dependent on the legality of the arrest, *DeFillippo*, 443 U.S. at 35, 99 S.Ct. 2627, the search of Xavier Williams himself on March 1, 1996 does not offend the Constitution. Therefore, the results of that search shall not be suppressed for being fruits of an illegal search.

### b. Search of the Toyota Land Cruiser

Det. Nugent conducted a warrantless search of Xavier Williams's 1994 green Toyota Land Cruiser. We find this search was lawful, however, under both the automobile and the search incident to valid arrest exceptions to the Fourth Amendment's warrant requirement. *See generally, United States v. Ross*, 456 U.S. 798,

---

**8.** In a post-hearing letter memorandum, counsel for Xavier Williams asserts that the Second Circuit has "expressly rejected" the government's contention that "a police officer can always find probable cause to arrest based solely upon the complaint of a victim," citing *Oliveira v. Mayer*, 23 F.3d 642 (2d Cir. 1994). Letter dated Nov. 26, 2001 at 2. First, such a contention is not necessary to reach our result, as the police were not blindly relying upon a victim's complaint but, rather, had good reason to rely upon the statement of a victim who had known the accused assailant personally.

Moreover, *Oliveira* is clearly distinguishable from the case at bar. In that case,

> a private motorist spotted [ ] three dark-skinned males, handling an expensive video camera while driving in a dilapidated station wagon through an affluent area of North Stamford, Connecticut. Suspicious merely because the camera appeared quite valuable and because the vehicle had New York license plates and had emerged from a dead-end street, the motorist called the police from his car phone and reported that there may have been a burglary.

*Oliveira*, 23 F.3d at 644. This report of allegedly criminal activity did not give the police probable cause to arrest the three men, and

their subsequent arrest was found to violate their Fourth Amendment rights. *Id.* at 647–48. In reaching this conclusion, the Court stated that "information about criminal activity provided by a single complainant can establish probable cause when that information is sufficiently reliable and corroborated," but found that this was not the case in the situation they confronted. *Id.* at 647.

*Oliveira*, thus, concerned a radically different set of facts than those we face here. Moreover, in that case, the Court took pains to distinguish cases where a *victim of*, rather than a *witness to*, a crime reports it to the police. *Id.*

The only other case from this Circuit on this issue cited in the letter, *Wu v. City of New York*, simply provides further support for our decision. 934 F.Supp. 581 (S.D.N.Y.1996). There, the Court stated that it is "well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth." *Id.* at 587 (citation and quotation marks omitted). There is ample reason, as demonstrated above, to believe that Mercado was telling the truth when he told the police that it was Xavier Williams who had shot him.

804–09, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

Under the automobile exception, a "warrantless search of a movable vehicle is permissible when the police have probable cause to believe that the vehicle contains contraband." *United States v. Harwood*, 998 F.2d 91, 96 (2d Cir.1993) (citing *Carroll v. United States*, 267 U.S. 132, 156, 45 S.Ct. 280, 69 L.Ed. 543 (1925), *California v. Acevedo*, 500 U.S. 565, 571, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991), *Ross*, 456 U.S. at 808–09, 102 S.Ct. 2157, and *Chambers v. Maroney*, 399 U.S. 42, 51–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970)). The Supreme Court has explained that "pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches [of vehicles] without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met." *California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985).

█ Warrantless searches authorized by the automobile exception are, however, "no broader and no narrower than a magistrate could legitimately authorize by warrant." *Ross*, 456 U.S. at 825, 102 S.Ct. 2157. Therefore, such a search must be confined to the areas within a vehicle where the searching officer has probable cause to believe contraband will be found. *Acevedo*, 500 U.S. at 580, 111 S.Ct. 1982. We find, for the reasons that follow, that Det. Nugent had probable cause to search the secret compartment in the Toyota at the time he did so.

█ The most powerful probable cause for this search comes from the statements of Mercado and the unnamed informant. We cannot, however, blindly accept these statements as true and reasonable to rely upon. Rather, we are obligated to determine their reliability based on the "totality of the circumstances," including the perceived "veracity" and "basis of knowledge" of the declarants. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Here, Det. Nugent had information from both Mercado and the unnamed informant that Xavier Williams's Toyota contained a secret compartment that often contained narcotics, currency and/or weapons. Statements made by a victim of a crime are presumed to be truthful, *Rowell*, 903 F.2d at 903, and information obtained from a confidential informant can support a finding of probable cause if it is deemed reliable. *United States v. Canfield*, 212 F.3d 713, 719 (2d Cir.2000). In this case, the unnamed informant was known by the NYPD to be a reliable source based on past performance. Therefore, it was reasonable for Det. Nugent to find him reliable. Moreover, the two statements corroborate each other. In sum, it was reasonable for Det. Nugent to believe that the secret compartment likely contained evidence of the crime he was investigating.

Furthermore, the search occurred less than an hour after Xavier Williams was pulled over by police in the Toyota. From experience with other suspects, it was reasonable for the police to believe that Xavier Williams may have stashed narcotics, weapons, or other evidence in the secret compartment when he realized he was about to be pulled over and possibly arrested. *Cf., e.g., Texas v. Brown*, 460 U.S. 730, 742–43, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

While we decline to consider whether Det. Nugent would have had probable cause at that time to search the entire Toyota, we find that he clearly had probable cause to search the secret compartment. As Det. Nugent limited his war-

rantless search to the secret compartment, *see* 10/16 Tr. at 42 ("I didn't search the [whole] car. I just went for the sole purpose of the compartment."), we find that this search was, in fact, undertaken with the requisite probable cause.

Finally, we note that Det. Nugent did not conduct the search of the Toyota's secret compartment at the site where Xavier Williams was pulled over. Rather, another officer drove the vehicle to the precinct house where it was subsequently searched by Det. Nugent. This, however, has no impact on the constitutionality of the search. *See, e.g., Florida v. Meyers,* 466 U.S. 380, 382, 104 S.Ct. 1852, 80 L.Ed.2d 381 (1984); *Michigan v. Thomas,* 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) ("the justification to conduct such a warrantless search does not vanish once the car has been immobilized"); *Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (where probable cause existed to effect a lawful warrantless search of car where it was stopped, a later warrantless search at the station house was lawful as well). In sum, the search of the secret compartment did not violate Xavier Williams's Fourth Amendment rights, and the fruits thereof shall not be suppressed. The motion is denied.

## C. Motions to Suppress the Fruits of the September 28, 2000 Searches

### 1. Facts

On September 27, 2000, pursuant to an arrest warrant issued in connection with the present indictment, NYPD Detective Peter Forcelli was searching the Bronx for Xavier Williams. Transcript of Suppression Hearing held October 17, 2001 ("10/17 Tr.") at 89. At one point, he spotted Xavier Williams's car, but the NYPD was unable to catch up to him and effect an arrest. *Id.* The next morning, however, Internal Revenue Service Special Agent Robert Ryan saw Xavier Williams's black 1993 Nissan Maxima (the "Nissan") parked in the parking lot outside 1609 East 174th Street, Bronx, New York. 10/16 Tr. at 53. Agent Ryan telephoned Det. Forcelli and other NYPD officers and requested their assistance in arresting Xavier Williams. *Id.;* 10/17 Tr. at 89–90.

The NYPD officers arrived shortly thereafter, whereupon they observed that Xavier Williams was in the process of driving the Nissan out of the parking lot. 10/16 Tr. at 53. The officers blocked the exit to the lot with a police car and arrested Xavier Williams, who was behind the wheel of the Nissan. *Id.* Xavier Williams was then handcuffed with his hands behind his back and placed in the back passenger-side seat of an unmarked police car. *Id.* at 54.

Det. Forcelli, in plain clothes and with his firearm holstered on his hip, sat down in the driver's seat of the police car and introduced himself to Xavier Williams. 10/17 Tr. at 90–92. Agent Ryan then sat down in the passenger seat, and Det. Forcelli read Xavier Williams his *Miranda* rights. *Id.* at 91; 10/16 Tr. at 54. When asked if he wished to waive his right to remain silent and speak with the officers, Xavier Williams responded that he was not sure, and had nothing to say at that time. 10/16 Tr. at 54–55; 10/17 Tr. at 92. Det. Forcelli then asked Xavier Williams if he would permit the officers to search the Nissan and his apartment. 10/16 Tr. at 55; 10/17 Tr. at 92–93. Xavier Williams responded, in substance, "Go ahead, you won't find anything." 10/16 Tr. at 55; 10/17 Tr. at 92–93. Agent Ryan then took the key chain containing both the Nissan and apartment keys, showed them to Xavier Williams, whereupon the latter pointed out which keys would access each. 10/16 Tr. at 55–56; 10/17 Tr. at 93. Throughout this exchange, the officers used a "calm"

tone of voice, and Xavier Williams was "calm" and "cordial." 10/16 Tr. at 55; 10/17 Tr. at 92. Officers then unlocked the Nissan and the apartment using the keys identified by Xavier Williams, seized items from each, and then drove the Nissan to an NYPD precinct. 10/16 Tr. at 56; 10/17 Tr. at 94–95. These items are the subject of the present motion.

### 2. Analysis

Both the search of the Nissan and the apartment were carried out without search warrants and, as such, are presumptively unconstitutional as violative of the Fourth Amendment. *See, e.g., Dyson,* 527 U.S. at 466–67, 119 S.Ct. 2013; *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Under certain circumstances, however, a warrantless search may, nevertheless, be constitutionally permissible. One such circumstance is when a search is conducted "pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *see also, e.g., United States v. Garcia,* 56 F.3d 418, 422 (2d Cir.1995).

■ For consent to validate an otherwise unconstitutional search, it must be "freely and voluntarily given" under the "totality of the circumstances." *Schneckloth,* 412 U.S. at 222, 226, 93 S.Ct. 2041. The essential inquiry is whether the consent was "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Wilson,* 11 F.3d 346, 351 (2d Cir.1993) (internal citations omitted). This is an objective test. *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (the proper inquiry is "what would the typical reasonable person have understood by the exchange between the officer and the suspect?"). Finally, the prosecution bears the burden of proving that consent was voluntarily given.

*Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

■ A brief survey of the "totality of the circumstances" demonstrates that the Government has fulfilled its burden and proved that Xavier Williams's consent to the searches of the Nissan and apartment was voluntary. First, the officers present when Xavier Williams gave his consent were speaking in a calm manner, did not threaten him in any way, and had their weapons holstered at all relevant times. *Cf. United States v. Wilderness,* 160 F.3d 1173, 1174–75 (7th Cir.1998) (consent voluntary where officers "politely asked" to search house, where one officer had a gun in his hand, but pointed at floor). Furthermore, Xavier Williams was calm and cordial when he consented to the searches. *Cf. United States v. Van Shutters,* 163 F.3d 331, 336 (6th Cir.1998) (finding of voluntary consent bolstered by fact that defendant was "cordial, cooperative, and helpful" to officers).

In response to the request for consent, Xavier Williams explicitly told the officers, in plain language, to "go ahead" and search the apartment and Nissan. *Cf. United States v. Lyton,* 161 F.3d 1168, 1171 (8th Cir.1998) (consent voluntary where defendant "invited" officer to check vehicle for guns and drugs); *United States v. Nobles,* 69 F.3d 172, 181 (7th Cir.1995) (consent was voluntary where, in response to officer's request to search bag, defendant dropped bag on floor and said, "Go ahead"); *United States v. Glover,* 957 F.2d 1004, 1007 (2d Cir.1992) (consent voluntary where defendant had "picked up his shoulder bag, threw it onto a desk, and told the officers to search it").

Of particular significance is the fact that Xavier Williams assisted the officers by pointing out which keys would unlock the Nissan and the apartment. *Cf. United States v. Glover,* 104 F.3d 1570, 1584 (10th

Cir.1997) (consent to search house voluntary where defendant gave house keys to officer); *United States v. McSween*, 53 F.3d 684, 688 (5th Cir.1995) (consent to search car voluntary where defendant helped officer remove interior paneling in car's hatchback). Moreover, in response to the search request, Xavier Williams voiced his belief that the officers would not find anything of significance. *Cf. United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir.1997) (defendant's wife's consent to search home was voluntary where wife stated that she "had nothing to hide"); *United States v. Crespo*, 834 F.2d 267, 272 (2d Cir.1987) (consent voluntary where defendant likely believed agents would not find hidden materials).

▮▮ In sum, Xavier Williams's consent was voluntary,[9] and the searches of the Nissan and the apartment were not "unreasonable" under the Fourth Amendment. Consequently, his suppression motion is denied.

### D. Motion to Suppress the Fruits of the November 2, 2000 Searches of the Lincoln Navigator

#### 1. Facts

During the September 28, 2000 search of Xavier Williams's Bronx River apartment, police seized a parking receipt or voucher from the Sheridan Garage Corporation. 10/16 Tr. at 59. On November 2, 2000, John O'Malley, an investigator from the United States Attorney's Office, faxed a copy of this receipt to IRS Special Agent Robert Ryan, who was participating in the investigation of Xavier Williams. *Id.* Following this lead, Agent Ryan went to the Sheridan Garage ("Garage"), identified himself to the owner, and showed her a copy of the receipt, which she recognized. *Id.* She told Agent Ryan that the owner of the vehicle's name was Xavier and that some friends of his had told her the previous day that they were going to remove an expensive radio from the vehicle that day as per Xavier's instructions. *Id.* at 59–60.

Agent Ryan then went with the Garage owner to the vehicle, a Lincoln Navigator sports-utility vehicle, noted the license plate, then left the Garage to call the NYPD for backup. *Id.* at 60; 10/17 Tr. at 96. Shortly thereafter, several NYPD officers arrived at the Garage. 10/16 Tr. at 60. Agent Ryan and these officers entered the Garage and were given the key to the Lincoln by the Garage's owner. *Id.* They entered the vehicle and tried to start the ignition but the battery was dead. *Id.* The officers jump-started the Lincoln and then Det. Nugent drove it to the precinct house. 10/16 Tr. at 60–61; 10/17 Tr. at 96. Upon jump-starting the vehicle, Det. Nugent heard a strange sound, one that sounded like a hydraulic motor, which later was determined to be a motor that operated a secret compartment in the Lincoln. 10/17 Tr. at 98–100.

Once back at the precinct, Det. Nugent parked the Lincoln in the secure supervisors' parking lot, and taped a garbage bag over the rear passenger-side window, which was broken prior to its seizure. 10/17 Tr. at 96. At some point while the vehicle was at the precinct,[10] Agent Ryan

---

9. We note that the fact that Xavier Williams was under arrest, in custody, and handcuffed at the time he gave consent to the searches does not as a matter of law require a finding of involuntariness. *Crespo*, 834 F.2d at 271 (citing *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)). Also, "knowledge of the right to refuse consent is not a requirement to a finding of voluntariness." *Id.* (citing *Schneckloth*, 412 U.S. at 231–33, 93 S.Ct. 2041).

10. It is unclear from the testimony whether it occurred before or after Det. Nugent sealed the window.

looked in the window of the Lincoln and observed, scattered throughout the vehicle, various documents, including receipts and invoices with the names "Anthony Walker" and "Xavier Torres" on them. 10/16 Tr. at 61–62. Agent Ryan testified that these names were known aliases of Xavier Williams. *Id.* at 62.

A search warrant was subsequently issued by this Court to search the Lincoln. 10/17 Tr. at 97. NYPD officers searched the vehicle, obtaining finger prints and tape lifts, and then an expert from the Drug Enforcement Agency crossed certain wires which opened a secret compartment located in a console between the front driver and passenger seats. *Id.* at 97–99. The compartment was empty. *Id.* at 99. Xavier Williams seeks to suppress the evidence obtained during these searches.

### 2. Analysis

■ When Det. Nugent removed the Lincoln from the Garage and drove it to the precinct, this constituted a warrantless seizure, as the Government concedes. Gov't Opp. at 57; *see Cardwell v. Lewis,* 417 U.S. 583, 592–96, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). Xavier Williams, as lessee, had a reasonable expectation of privacy in the items in the vehicle. Therefore, he has standing to challenge this search as a violation of the Fourth Amendment. *See, e.g., United States v. Miller,* 84 F.3d 1244, 1250 (10th Cir.1996). Furthermore, this seizure is presumptively unconstitutional, as it was effected without a warrant. *United States v. Scopo,* 19 F.3d 777, 782 (2d Cir.1994). Nevertheless, we find that this seizure was constitutionally permissible under the automobile exception to the warrant requirement. *See generally* Section II.B.2.b, *supra.*

■ For the automobile exception to apply and for the seizure to be valid, the Government must prove that the law enforcement officers who seized the vehicle had probable cause to believe it contained evidence, contraband, or weapons. *Id.* We find that Det. Nugent, at the time he seized the Lincoln, did have the requisite probable cause to do so for several reasons.

First, Det. Nugent had reason to believe that the Lincoln was recently driven by Xavier Williams, because a parking receipt matching the one attached to the Lincoln's keys had been found in Xavier Williams's Bronx River apartment. Furthermore, the Garage owner had told Agent Ryan that the vehicle belonged to "Xavier," and he believed that "Xavier" was, in fact, Xavier Williams. 10/16 Tr. at 60. Xavier Williams had been arrested one month before, on a multiple-count indictment alleging serious crimes including narcotic-trafficking and murder. The officers knew that he had previously hidden weapons and contraband, as well as other potential evidence, in secret compartments in the various vehicles he used, such as the Toyota. *See* Section II.B.1, *supra.* Thus, it was reasonable for them to believe that the Lincoln might contain contraband or weapons, possibly in a secret compartment.

Second, the owner of the Garage told Agent Ryan that "Xavier's" friends intended to come by the Garage that day in order to remove an expensive radio from the Lincoln. It was reasonable for the officers to suspect that these friends intended not to remove a radio from the vehicle but, rather, they were planning to remove contraband that Xavier Williams did not want the police to find while they built their case against him. For these reasons, we find that Det. Nugent had probable cause to believe the Lincoln contained contraband and seize the Lincoln.

Moreover, the lawfulness of the seizure is bolstered by the exigent circumstances

created when the officers became aware that "Xavier's" friends were due to remove something from the Lincoln that very day. *See, e.g., Schmerber v. California*, 384 U.S. 757, 770–71, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (no search warrant required when officer believed delay would result in destruction of evidence); *United States v. Thomas*, 893 F.2d 482, 486 (2d Cir.1990) (same); *United States v. Markling*, 7 F.3d 1309, 1319 (7th Cir.1993) (warrantless search of car believed to contain evidence of drug dealing permitted under automobile exception where one of defendant's "friends or associates could have moved the car at any time" and defendant had carried drugs with him in the car in the recent past).

Finally, we assume, without deciding, that when Agent Ryan peered into the windows of the Lincoln, this constituted a "search" within the meaning of the Fourth Amendment. As Det. Nugent had probable cause to seize the vehicle because he believed it likely contained contraband, weapons, or other evidence, we find that Agent Ryan also had such probable cause because he was working so closely with the NYPD and others in its investigation of Xavier Williams. Thus, for the same reasons that Det. Nugent's search was Consti-

tutionally permissible,[11] we find that this search, too, was lawful. Finally, we note that all subsequent searches of the Lincoln were done under the authority of a search warrant issued by this Court, and are unchallenged. The motion to suppress is denied.

### E. Motion to Suppress Michael Williams's March 22, 1996 Statement

Michael Williams moves to suppress a statement he made to Detective James Cvetic of the Allegheny County Police Department on the evening of March 22, 1996. The Court held a hearing on this motion on October 30, 2001, where we heard testimony from only one witness, Det. Cvetic, who was called by the Government. Based on the evidence adduced at the hearing and a record which had come into the United States Attorney's possession only the day before, the conclusion could have been reached that Det. Cvetic had actual knowledge that Michael Williams was represented by counsel at the time he interviewed him.[12] If so, Michael Williams's March 22, 1996 statement would be inadmissible.[13] Following the hearing, the Government "withdr[ew] its opposition to the motion of defendant Mi-

---

11. *See* discussion immediately above.

12. Michael Williams was arrested in New York in March 1996. Transcript of Suppression Hearing held October 30, 2001 ("10/30 Tr.") at 3. He was subsequently extradited to Pennsylvania, and, on the morning of March 22, 1996, he was arraigned before a deputy coroner, who completed a "Criminal Arraignment Procedure Form" (the "CAP form") as a record of the arraignment. *Id.* at 11–12. The CAP form indicates that Michael Williams told the deputy coroner that he was represented by Paul Gettleman, a Pittsburgh attorney. *Id.* at 12–13. Although he denies being there, Detective James Cvetic of the Allegheny County Police Department is clearly listed as "present" on the CAP form. *Id.*

13. In *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), the Supreme Court held that after a defendant asserts her right to counsel at an arraignment or similar proceeding, any subsequent waiver of that right is presumed invalid, regardless of whether the waiver was knowing and voluntary. *Id.* at 636, 106 S.Ct. 1404. Therefore, Michael Williams effectively asserted his Sixth Amendment right to counsel at the preliminary arraignment, and any alleged waiver of counsel later the same day is presumed invalid, even if the waiver was knowing and voluntary. It is well-settled that statements "elicited in violation of this rule are inadmissible in the government's case-in-chief," *United States v. Abdi*, 142 F.3d 566, 569 (2d Cir.1998) (citing *Jackson*, 475 U.S. at 636, 106 S.Ct. 1404).

chael Williams to suppress the [March 22, 1996] statement" and will "not seek to admit the defendant's statement [ ] in its case-in-chief." Letter dated Oct. 31, 2001 ("10/31 Ltr.") at 1–2.

In its October 31, 2001 letter, however, the Government "reserv[ed] the option of seeking to admit the March 22, 1996 statement to impeach the defendant, should he testify at trial, or to rebut evidence advanced by the defendant at trial that is inconsistent with, or contradicted by, his statement." Although it is premature to rule on such trial evidence issues, we note that, while use of a defendant's statement to impeach his testimony is a well-settled exception to the exclusionary rule,[14] the Government's other "reservations" are significantly more problematic.[15]

### F. Motion to Suppress Elijah Bobby Williams's April 21, 1996 Statement

#### 1. Facts

On April 21, 1996, Elijah Bobby Williams was arrested by the West Virginia State Police in connection with a reported stolen vehicle. Transcript of Suppression Hearing held October 31, 2001 ("10/31 Tr.") at 4–5. At that time, he was a wanted person in connection with a triple homicide that occurred in Allegheny County, Pennsylvania. Id. at 5. The West Virginia State Police, being aware that the Allegheny County Police Department sought Elijah Bobby Williams, notified the latter that they had him in custody in Morgantown, West Virginia. Id. at 4–5, 20. Upon receiving this information, Detectives Gary Tallant and Regis Kelly of the Allegheny County Police Department, drove to Morgantown to interview Elijah Bobby Williams. Id. at 6, 23.

Det. Tallant found Elijah Bobby Williams in the sergeant's office at the West Virginia Police Department in Morgantown, introduced himself, and told the latter that he (Tallant) was there in connection with the triple homicide that occurred in Pittsburgh. Id. at 7–9. Det. Tallant told Elijah Bobby Williams, in substance, that he wanted to question him about background or pedigree information, such as name, date of birth, and address. Id. at 9; Affidavit of Elijah Williams ("E.B.W.Aff.") ¶ 2.

Det. Tallant testified at a hearing before the Court that while he was asking these pedigree questions, Elijah Bobby Williams interrupted him, saying, in substance, that he did not understand why he was arrested because he had nothing to do with the homicides, and, further, that he wanted to talk to the Detective about the homicides. 10/31 Tr. at 10–11. At this point, according to Det. Tallant, he stopped taking the pedigree information, and told Elijah Bobby Williams that "if he wanted to speak to

---

14. *Michigan v. Harvey,* 494 U.S. 344, 351, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990). We note, however, that the Government will only be permitted to use the March 22, 1996 statement to impeach Michael Williams if it demonstrates that the statement was "both voluntary and accompanied by a knowing and voluntary waiver of the defendant's right to counsel." *Abdi,* 142 F.3d at 570; *United States v. Spencer,* 955 F.2d 814, 819 (2d Cir. 1992).

15. *See, e.g., James v. Illinois,* 493 U.S. 307, 314, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990) (refusing to expand impeachment exception to include impeachment of defense witnesses other than the defendant herself); *Williams v. Poulos,* 11 F.3d 271, 287 n. 35 (1st Cir.1993) ("In criminal law, evidence obtained in violation of the Fourth Amendment can ... only be used to impeach on matters plainly within the scope of the defendant's direct examination.") (citations and internal quotations omitted); *United States v. Hinckley,* 672 F.2d 115, 132–34 & n. 117 (D.C.Cir.1982) (refusing to extend impeachment exception to include rebuttal of substance of defendant's insanity defense).

me in regards to the homicide, that I was going to advise him first of his *Miranda* rights." *Id.* at 11. Det. Tallant testified that, at this point, he read Elijah Bobby Williams his *Miranda* rights from a pre-printed form, and then presented the form to him and had him read it. *Id.* Elijah Bobby Williams signed the form. *Id. See* Gov't Ex. 1 from October 31, 2001 hearing (signed *Miranda* form). Det. Tallant testified, further, that Elijah Bobby Williams stated that "he did not have an attorney, he did not want one either, and that he wanted to answer questions." 10/31 Tr. at 11. Finally, Det. Tallant testified that, on April 17, 1996, several days earlier, he happened to run into James Ecker, a Pittsburgh attorney who had previously contacted the Allegheny County Police Department regarding Elijah Bobby Williams. *Id.* at 13. At that time, Mr. Ecker indicated to Det. Tallant that the former no longer represented Elijah Bobby Williams. *Id.*

Elijah Bobby Williams, who did not testify at the suppression hearing, stated in a signed affidavit that after he agreed to be interviewed about background information, Detective Tallant "began to ask questions about a homicide, [and] I asked to speak to my lawyer. The detective refused my request and continued his interrogation for approximately five hours." E.B.W. Aff. ¶ 2. Elijah Bobby Williams moves to suppress the statement he made to Det. Tallant on the grounds that it was taken in violation of his Sixth Amendment right to counsel.

### 2. Analysis

"The Sixth Amendment right to counsel attaches at 'the time that adversary judicial proceedings have been initiated.'" *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 349 (2d Cir.1998) (quoting *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)). In this context, we look to state law to determine when "adversary judicial proceedings" have begun. *Id.* Under West Virginia law, an "adversary judicial criminal proceeding is instituted against a defendant where the defendant after his arrest is taken before a magistrate ..., and is, *inter alia,* informed ... of the complaint against him and of his right to counsel." *State v. Sheppard,* 172 W.Va. 656, 310 S.E.2d 173, 181 (1983). Under Pennsylvania law, "adversary judicial proceedings" begin when the "suspect has been charged with the offense in question." *Commonwealth v. Arroyo,* 555 Pa. 125, 723 A.2d 162, 167, 170 (1999) (citing *Moran v. Burbine,* 475 U.S. 412, 418, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

At the time Elijah Bobby Williams was arrested, however, he had neither been charged with the triple homicide, nor had he been brought before a magistrate and informed of any charge against him with regard to that event. *See* Gov't Ex. 2 from October 31, 2001 hearing at 6 (Det. Tallant's report of interview with Elijah Bobby Williams ended when the time came for the latter to be arraigned). Thus, under either Pennsylvania or West Virginia law, Elijah Bobby William's Sixth Amendment right to counsel had not attached at the time he spoke with Det. Tallant on April 21, 1996.

Furthermore, even assuming, *arguendo,* that Elijah Bobby Williams's Sixth Amendment right to counsel had attached, that right may be waived. The Supreme Court has held that an "accused who is admonished with the warnings prescribed by this Court in [*Miranda*] has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Patterson v. Illinois,*

487 U.S. 285, 286, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). We find that Det. Tallant was a credible witness, and that his version of the interview he conducted with Elijah Bobby Williams on April 21, 1996 is accurate, notwithstanding the latter's affidavit.[16] In addition, we note that there was no evidence of coercion in obtaining a waiver of *Miranda* rights from Elijah Bobby Williams. Thus, we find that Det. Tallant informed Elijah Bobby Williams of his *Miranda* rights, and that Elijah Bobby Williams did effectively waive those rights by signing the document listing those rights. *See* Gov't Ex. 1 from October 31, 2001 hearing. For the foregoing reasons, Elijah Bobby Williams's motion to suppress his April 21, 1996 statement is denied.

### G. Motion to Dismiss Counts Five, Six, and Seven for Lack of Venue

#### 1. Facts

Michael Williams moves to dismiss Counts Five, Six, and Seven, asserting that venue is improper in the Southern District of New York. These Counts of the indictment accuse the three Williams defendants of the murders of Timothy Moore, Joel Moore, and Robert James, respectively, in violation of 18 U.S.C. § 1959.[17] It is undisputed that the "fatal blow" was dealt in the Western District of Pennsylvania. Consequently, Michael Williams contends that venue is only proper in that district, and that these Counts should be dismissed by this Court for lack of venue.

#### 2. Analysis

Article III of the Constitution requires that "[t]he trial of all Crimes ... shall be held in the State where the said Crimes have been committed." Furthermore, the Sixth Amendment declares that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." These Constitutional precepts[18] have been embodied in Rule 18 of the Federal Rules of Criminal Procedure, which states that criminal "prosecution

---

**16.** We note that Elijah Bobby Williams did not testify at the hearing. Therefore, we had no opportunity to examine his demeanor when giving his version of events. In addition, his two paragraph affidavit did not provide enough detail to create a meaningful dispute.

**17.** Sec.1959. Violent crimes in aid of racketeering activity:

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished -

(1) for murder, by death or life imprisonment, or a fine under this title, or both ... (2) for maiming, by imprisonment for not more than thirty years or a fine under this title, or both;

\* \* \* \* \* \*

(b) As used in this section - (1) "racketeering activity" has the meaning set forth in section 1961 of this title; and (2) "enterprise" includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce.

**18.** For a discussion of the historical background of these constitutional provisions, *see United States v. Saavedra*, 223 F.3d 85, 88 (2d Cir.2000).

shall be had in a district in which the offense was committed."

The Supreme Court has recently reaffirmed that the place where a crime is deemed to have been committed, or *locus delicti,* is " 'determined from the nature of the crime alleged and the location of the act or acts constituting it.' " *United States v. Cabrales,* 524 U.S. 1, 6–7, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998) (quoting *United States v. Anderson,* 328 U.S. 699, 703, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946)). "In performing this inquiry, a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *United States v. Rodriguez–Moreno,* 526 U.S. 275, 279, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999). Furthermore, "where the acts constituting the crime and the nature of the crime charged implicate more than one location, the constitution does not command a single exclusive venue." *United States v. Reed,* 773 F.2d 477, 480 (2d Cir.1985).

■ Counts Five, Six, and Seven all accuse the Williams defendants of violating 18 U.S.C. § 1959. To prove its case on these Counts, the Government must show that the defendants (1) committed the alleged murders (2) "as consideration for the receipt of, [or] as consideration for a promise and agreement to pay, anything of pecuniary value from the Torres Organization, [or] for the purpose of gaining entrance to [or] maintaining and increasing their positions in the Torres Organization, an enterprise engaged in racketeering activity." Indictment ¶¶ 24, 26, 28; *see also Saavedra,* 223 F.3d at 91 (section 1959 "defines a continuing offense," and the fact that a defendant committed a proscribed act " 'for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity' [ ] is a critical conduct element of the offense"); *Unit-*

*ed States v. Reyes,* 157 F.3d 949, 955 (2d Cir.1998); *United States v. McCall,* 915 F.2d 811, 816 (2d Cir.1990) (enterprise element is a "statutory element" of § 1959). Therefore, as these Counts charge "continuing offenses," venue is properly governed by 18 U.S.C. § 3237(a), which provides that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be . . . prosecuted in *any district* in which such offense was begun, continued, or completed." (emphasis supplied); *see also United States v. Yu,* 1998 WL 57079, at *3 (S.D.N.Y. Feb. 5, 1998); *United States v. Perez,* 940 F.Supp. 540, 548 (S.D.N.Y.1996).

■ The defendants have not, in Counts Five, Six, and Seven, been accused simply of murdering the three victims. Rather, the Government charges, and has the burden of proving at trial, that they committed the murders within the framework of the Torres Organization. *See* Indictment ¶¶ 24, 26, 28; Gov't Opp. at 82 n. 17. These Counts allege that the Williams defendants committed these murders in aid of racketeering "in the Western District of Pennsylvania *and elsewhere.*" Indictment ¶¶ 24, 26, 28 (emphasis supplied). It is clear from the indictment that the Government alleges that the Williams defendants were actively engaged in the Torres Organization in the Southern District of New York. *See, e.g., id.* at ¶¶ 4, 5, 7, 21–22 (accusing the Williams defendants of conspiring to murder Timothy Moore and Robert James "in the Southern District of New York"). Therefore, the "enterprise" element of 18 U.S.C. § 1959(a) was allegedly "committed in more than one district," one of which was the Southern District of New York and venue is proper in this district under 18 U.S.C. § 3237(a). Accordingly, defendants' motions to dis-

miss Counts based on lack of venue is denied.

## H. Motion to Dismiss Counts for Violation of the Double Jeopardy Clause

Xavier Williams moves to dismiss Count Three and Racketeering Act One of Count One, which allege the conspiracy to murder and attempted murder of Victor Mercado in October of 1995, because the "inclusion of these charges in this indictment violates [his] constitutional protection against double jeopardy and his rights under the *Petite* policy of the United States Attorney's Office since he has previously been charged, tried and acquitted by a jury of that charge in the Bronx Supreme Court." X.W. Mem. at 28. For the following reasons, his motion is denied.

### 1. Dual Sovereignty Doctrine

■ Successive prosecutions brought by different sovereigns do not violate the Double Jeopardy Clause of the Fifth Amendment. *Heath v. Alabama,* 474 U.S. 82, 92, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) ("This Court has plainly and repeatedly stated that two identical offenses are *not* the 'same offence' within the meaning of the Double Jeopardy Clause if they are prosecuted by different sovereigns.") (emphasis in original); *United States v. Lanza,* 260 U.S. 377, 382, 43 S.Ct. 141, 67 L.Ed. 314 (1922) ("an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each," and this "is not double jeopardy"). This is known as the "dual sovereignty doctrine." Furthermore, the Supreme Court "has uniformly held that the States are separate sovereigns with respect to the Federal Government." *Heath,* 474 U.S. at 89, 106 S.Ct. 433; *accord Abbate v. United*

*States,* 359 U.S. 187, 193–94, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (collecting cases).

In *Bartkus v. Illinois,* the Supreme Court left open the possibility that successive prosecutions may violate the Double Jeopardy Clause if the second prosecuting sovereign was "merely a tool" of the first. 359 U.S. 121, 123, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); *see also United States v. All Assets of G.P.S. Automotive Corp.,* 66 F.3d 483, 494 (2d Cir.1995) ("our precedents, like those of other circuits, make clear that [the *Bartkus* exception] applies only in an 'extraordinary type of case,' perhaps only when one sovereign has essentially manipulated another sovereign into prosecuting") (quoting *United States v. Davis,* 906 F.2d 829, 832 (2d Cir.1990)). Apart from merely asserting that *Bartkus* is applicable to the present indictment, however, Xavier Williams has made no showing whatsoever that the federal government was merely the tool of New York State. Therefore, we have no cause to apply *Bartkus* and depart from the firmly-grounded dual sovereignty doctrine here.

Finally, Xavier Williams invites this Court to simply "eliminate[ ] or severely restrict[ ]" the dual sovereignty doctrine and dismiss the Counts pertaining to the attempted murder of Victor Mercado. X.W. Mem. at 32. We decline this invitation and hold that the present indictment does not violate his rights under the Double Jeopardy Clause.

### 2. Petite Policy

Xavier Williams also asserts that the present indictment violates "his rights under the *Petite* policy of the United States Attorney's Office." [19] *Id.* at 28. This argument is unavailing.

---

**19.** The *Petite* policy "is an internal statement by the United States Attorney General setting

forth guidelines for federal prosecutors regarding dual and successive federal prosecu-

First, we note that the Government submitted a copy of a letter from James K. Robinson, Assistant Attorney General, to the Honorable Mary Jo White, United States Attorney for the Southern District of New York, granting authorization to prosecute Xavier Williams for conspiracy to murder and attempted murder of Victor Mercado. Gov't Opp. Ex. G. This letter makes clear that, as far as the Department of Justice is concerned, the *Petite* policy is inapplicable to the present indictment. *Id.*

▇ In any event, this decision by the Department of Justice is "not subject to judicial review." *Ng*, 699 F.2d at 71. The *Petite* policy states, in no uncertain terms, that it "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, that are enforceable at law by any party in any matter, civil or criminal, nor does it place any limitations on otherwise lawful litigative prerogatives of the Department of Justice." United States Attorneys' Manual (USAM) § 9–2.031(F). Contrary to Xavier Williams's assertion, the *Petite* policy simply does not create any rights that can be violated. *United States v. Catino*, 735 F.2d 718, 725 (2d Cir.1984) (where "a federal prosecution follow[s] a state conviction for the same conduct, [the *Petite* ] policy affords defendants no substantive rights.") (dictum); *Ng*, 699 F.2d at 71 (*Petite* policy is "merely an internal guideline for exercise of prosecutorial discretion, not subject to judicial review").

Accordingly, because the Department of Justice followed the *Petite* policy and because, even if they had not, that failure is not reviewable here, we refuse to dismiss Count Three and Racketeering Act One of Count One on this ground.

tions." *United States v. Ng*, 699 F.2d 63, 66

## I. Motions to Order the Government to Provide the Defendants With a Bill of Particulars

Xavier and Michael Williams seek an order directing the Government to provide them with a bill of particulars. For the reasons that follow, these motions are denied.

### 1. Background

The present indictment charges Xavier Williams with, *inter alia*, the murders of Timothy Moore, Joel Moore, and Robert James on or about February 18, 1996, as well as conspiracy to commit those murders. In his brief, Xavier Williams states that "[t]he discovery materials which the government has provided to date ... indicate that on [or about February 18, 1996], '*two* armed suspects [shot the victims],' ... and that those two shooters are alleged to be co-defendants Michael Williams and Elijah Williams." X.W. Mem. at 34. Xavier Williams states that he has

> repeatedly asked the government to specify whether it is claiming that defendant Xavier Williams was a shooter or present at the scene of the shootings or if not, then what role it is claiming that defendant Xavier Williams played in those shootings. However, to date, the government has refused to provide any information beyond a general statement that defendant Xavier Williams was "involved."

*Id.* Xavier Williams contends that, as a "defendant's involvement in a capital offense must be 'substantial' in order to render that defendant death eligible," information regarding Xavier Williams's alleged role in the triple homicide is "vitally important" not only for general trial preparation, but also "for his opposition in the

n. 3 (2d Cir.1983).

death-penalty authorization process which is currently under way." *Id.* at 35. Thus, Xavier Williams petitions the Court to order the Government to produce a bill of particulars describing exactly what role the Government alleges that Xavier Williams's played in the triple homicide.

Michael Williams, too, requests that the Court order the Government to provide him with a bill of particulars. His reasoning, however, is based on the fact that the indictment makes numerous references to "others known and unknown." *See, e.g.,* Indictment ¶ 1 ("The Torres Organization, whose members and associates at various times included [Xavier Williams, Elijah Bobby Williams, Michael Williams, Kelly Rolon] and others known and unknown, operated in the New York Metropolitan area, Pittsburgh, Pennsylvania, and elsewhere."). Michael Williams seeks the names of these "known and unknown" persons.

### 2. Analysis

■ Rule 7(f) of the Federal Rules of Criminal Procedure state that "the court *may* direct the filing of a bill of particulars." (emphasis supplied). Thus, the issue of whether to direct the Government to file a bill of particulars is reserved to the discretion of the court. In exercising this discretion, we are guided by the purpose a bill of particulars is designed to serve, namely, "to provide [the] defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at the trial." *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990).

■ As "an indictment is adequate so long as it contains the elements of the offense, sufficiently apprises [sic] the defendant of what he must be prepared to meet, and is detailed enough to assure against double jeopardy," *United States v. Salazar,* 485 F.2d 1272, 1277 (2d Cir.1973), a demand for a bill of particulars should not be granted unless " 'the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.' " *Torres,* 901 F.2d at 234 (quoting *United States v. Feola,* 651 F.Supp. 1068, 1132 (S.D.N.Y.1987)). "Thus, courts have refused to treat a bill of particulars as a general investigative tool for the defense, or as a device to compel disclosure of the Government's evidence or its legal theory prior to trial." *Feola,* 651 F.Supp. at 1132 (collecting cases).

The present indictment is sufficient to apprize Xavier Williams of that which he is accused. It alleges that he murdered, and conspired to murder, Robert James, Tim Moore, and Joel Moore, in the Western District of Pennsylvania, on or about February 18, 1996. At trial, the Government will have the burden of proving these charges and, after it attempts to do so, Xavier Williams will know with complete specificity the precise theory of the Government's case against him. For now, however, the indictment provides him with enough information to determine the charge he must be prepared to meet,[20] and, therefore, a bill of particulars is not warranted. Xavier Williams's motion is denied.

The motion by Michael Williams for a bill of particulars naming the persons list-

---

**20.** Moreover, in addition to the information contained in the indictment, the Government has also provided the defendants with an abundance of discovery which should help place the defendants on notice as to the crimes for which they are charged. *See, e.g.,*

*United States v. Society of Indep. Gasoline Marketers of Am.,* 624 F.2d 461, 466 (4th Cir.1979) (because government provided "extensive disclosure" to defendants, district court did not err by denying motion for bill of particulars).

ed as "others known and unknown" in the indictment is likewise denied. This request is nothing more than an "ill-disguised attempt[ ] at general pre-trial discovery," *Torres*, 901 F.2d at 234, and, as such, must be rejected. *See United States v. Boneparth*, 52 F.R.D. 544, 545 (S.D.N.Y. 1971) ("[t]he government does not have to comply with [such] requests because they are in effect requests for the names of government witnesses").

### J. Motions for Discovery

Michael Williams and Xavier Williams also move for an order requiring the Government to provide them with certain discovery in advance of trial. Michael Williams petitions the Court to order the Government to provide Federal Rule of Evidence 404(b) "other bad acts" evidence "several months before trial commences." M.W. Mem. at 15. Xavier Williams requests that the Court enter an order to compel the Government to "disclose immediately" many classes of discovery. X.W. Mem. at 35. These classes are, in general terms,[21] "Evidence and Information Tending to Show the Existence of Mitigating Factors," [22] "Evidence and Information Tending to Show the Non–Existence of Aggravating Factors," [23] "Evidence and Information Tending to Show the Strength of the Evidence Supporting the [Xavier Williams's] alleged guilt of the Murders charged and Possible Disproportionate Treatment of Minority Defendants in the Implementation of the Federal Death Pen-

alty," [24] "all statements of coconspirators which the government alleges were made during the course of and in furtherance of the conspiracies charged," and "all information of other crimes, wrongs or bad acts alleged to have been committed by the defendants which the government intends to proffer against them under Rule 404(b) of the Federal Rules of Evidence." X.W. Mem. at 47–58.

The defendants offer several theories to undergird their claims that they are entitled to this discovery, namely the Jencks Act, *Brady, Giglio,* Rule 404(b), and the USAM "Death Penalty Protocol" § 9–10.000 et seq. (the "Protocol"). Each will be discussed seriatim.

### 1. Jencks Act, 18 U.S.C. § 3500, Fed. R.Crim.P. 26.2

In *Jencks v. United States*, the Supreme Court held that a criminal defendant had a due process right to inspect prior statements of government witnesses for impeachment purposes. 353 U.S. 657, 668–69, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). Congress codified and clarified this holding by enacting the Jencks Act, 18 U.S.C. § 3500.[25] The Jencks Act directs that "no statement ... by a Government witness ... shall be the subject of subpena [sic], discovery, or inspection until said witness has testified on direct examination in the trial of the case." Thus, to the extent that the defendants' motions request an order

---

**21.** Within these general categories, Xavier Williams requests no fewer than sixteen specific types of discovery. X.W. Mem. at 48–57. As the present discussion will make clear, there is no need to enumerate each specific request.

**22.** *See* 18 U.S.C. § 3592(a), 21 U.S.C. § 848(m).

**23.** *See* 18 U.S.C. § 3592(c), 21 U.S.C. § 848(n).

**24.** *See* 18 U.S.C. § 3593(f).

**25.** Fed.R.Crim.P. 26.2 incorporates the requirements of the Jencks Act, but is broader in scope. Rule 26.2 applies to all witnesses, while the Jencks Act applies only to government witnesses. For the present discussion, however, this distinction is immaterial.

pursuant to the Jencks Act requiring the Government to provide witness statements before such witnesses testify, they are denied.

 To be sure, we merely refuse to *order* the Government to produce their witnesses' prior statements before those witnesses testify on direct examination at trial. The Government is, however, perfectly free to disclose such statements earlier, of its own volition. *See, e.g., In re United States,* 267 F.3d at 146 n. 12 ("in many cases-perhaps in most-prosecutors disclose impeachment materials to a defendant early in the proceedings, without particular regard to the outer limits established by the Jencks Act," and "we do not intend to limit this often salutary practice, or to foreclose other informal arrangements" by refusing to compel such disclosure). The Government stated in its brief that it "intends to make ... Jencks Act material [available to the defendants] a reasonable period of time before the witness is called to testify on direct examination ... [to] allow defense counsel adequate time to prepare for cross-examination of Government witnesses as they come up at trial." Gov't Opp. at 106. The Court endorses such voluntary cooperation[26] between the parties.

## 2. *Brady and Giglio*

### a. *Scope*

 The Supreme Court, in *Brady v. Maryland,* held that "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *In re United States,* 267 F.3d at 139 (quoting *Brady,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). *Brady* material includes not only evidence that is directly exculpatory, but also evidence that tends to impeach the credibility of a government witness. This subset of *Brady* material is called *Giglio* material, after *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). *Brady* and *Giglio* do not require that a prosecutor "deliver his entire file to defense counsel," but rather, that she disclose any and all evidence that, "if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). As the Second Circuit has recently stated, "In the context of *Brady,* a defendant is deprived of a fair trial only where there is a reasonable probability that the government's suppression affected

---

**26.** We note that several courts have found informal agreements by the prosecution to provide Jencks Act material to the defense earlier than contemplated by the statute to be binding. *See United States v. Lopez,* 147 F.3d 1, 3–5 (1st Cir.1998) (where defendant moved for early Jencks Act disclosure, government had agreed to produce Jencks Act material fourteen days before trial, and district court had issued an order stating that "[t]o the extent of [the government's] compliance, the defendant's motion is allowed," this order was binding on the government (although the government's eventual failure to comply was held harmless)); *United States v. Mavrokordatos,* 933 F.2d 843, 846–47 (10th Cir.1991) (government's "agreement" to produce Jencks Act material fifteen days before trial

"established the deadline wholly outside of the [Jencks] Act"); *United States v. Hubbard,* 474 F.Supp. 64, 86 (D.D.C.1979) (where, "[d]uring the informal phase of discovery, the government agreed to provide Jencks Act material a reasonable time in advance of trial," "in view of the government's earlier representations, the Court shall require the government to fulfill its promise"). *Contra United States v. Exolon–Esk Co.,* 1995 WL 46719, at *4 (W.D.N.Y. Jan. 19, 1995) (rejecting the rationale of *Hubbard,* because that court "failed to identify a legal rule in support of its order" and because "a district court has no inherent power to amend or modify the provisions of the [Jencks] Act") (internal quotation omitted).

the outcome of the case, or where the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *In re United States*, 267 F.3d at 135 (citing *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375, and quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

Framing the test in this manner, however, creates a practical problem:

> An assessment of whether an outcome would have been different if undisclosed evidence had been disclosed is best made after a trial is concluded. At that point the significance of the undisclosed evidence can be considered in light of the strength of all the evidence indicating guilt. The prosecutor, however, cannot await the outcome and must therefore make a prediction before the trial as to how the nondisclosure of favorable evidence will be viewed after the trial.

*Id.* at 143. Thus, a prosecutor is forced to make an educated guess as to whether the withholding of a given piece of evidence will have a "reasonable probability" of affecting the outcome of the case or undermining confidence in the verdict. *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. The Government has apparently already made such a prediction as it represented to the Court that it "is aware of" and has "met its *Brady* obligations." Gov't Opp. at 102. The Government is also apparently aware of its continuing duty to disclose such evidence if and when it comes to light. *Id.* In light of the Government's good faith representations, we decline to order the Government to comply with *Brady*. *See, e.g., United States v. Nunez*, 2001 WL 91708, at *7 (S.D.N.Y. Feb. 1, 2001); *United States v. Gallo*, 1999 WL 9848, at *8 (S.D.N.Y. Jan.11, 1999) (collecting cases); *cf. United States v. Armstrong*, 517 U.S. 456, 463, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)

(" 'in the absence of clear evidence to the contrary, courts presume that [United States Attorneys] have properly discharged their official duties'") (quoting *United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926)). Of course, "the prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs.*, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

### b. Timing

Not surprisingly, Xavier Williams would like all *Brady* material, including *Giglio* material, to be turned over immediately. X.W. Mem. at 38–40, 46–47. The Government, for its part, wishes to reserve the option to wait until its witnesses are "called to testify at trial" before disclosing *Giglio* material. Gov't Opp. at 103. The Government makes a distinction between "directly exculpatory" *Brady* material, on the one hand, and "impeachment" *Brady* material, also known as *Giglio* material. *Id.* at 103–04, 96 S.Ct. 2392. It acknowledges that, with regard to exculpatory *Brady* material, "additional time may be needed for the defense to make effective use of this information" because such information "often becomes part of the defense's direct case and provides leads and new theories of defense." *Id.* at 104, 96 S.Ct. 2392. As for *Giglio* material, however, the Government claims that "[n]o extended pretrial investigation and preparation of such material is necessary for its effective use." *Id.* (citing *United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial.")).

The Second Circuit has recently made clear that the timing of *Brady* disclosure is a matter to be determined in a case-by-case manner by holding that the Govern-

ment must disclose *Brady* material "no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made." *In re United States*, 267 F.3d at 142. In other words, the Constitution requires nothing more than that *Brady* material must be disclosed "in time for its effective use at trial." *Id.*

Nevertheless, the Government has stated that it "intends to make [*Giglio*] material [available] a reasonable period of time before the witness is called to testify on direct examination." Gov't Opp. at 106. We accept this representation and expect the Government to abide by its promise. Therefore, Xavier WIlliams's motion seeking an order is denied.

### 3. Rule 404(b)

Rule 404(b) of the Federal Rules of Evidence provides that evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but such evidence may be admissible for other purposes. A condition of its admissibility, however, is that "upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Fed.R.Evid.

404(b). Xavier Williams and Michael Williams request that the Court order the Government to give such notice immediately, or at least one month before trial, respectively. X.W. Reply at 44; Michael Williams's Reply Memorandum of Law ("M.W.Reply") at 13. The Government, for its part, proposes that it provides this notice two weeks before trial.[27] Gov't Opp. at 108.

The Rule does not offer a definition of "reasonable notice," but rather leaves it to the discretion of the district courts to decide on the basis of the "circumstances of each case." Fed.R.Evid. 404 Advisory Committee Note (1991 Amends). Furthermore, in deciding what will constitute "reasonable notice" in this case, we are mindful of the purposes of the notice requirement, namely, "to reduce surprise and promote early resolution on the issue of admissibility." *Id.* As this is a complex case in which the defendants are accused of very serious crimes, we will order the Government to provide a statement of the general nature of any evidence it intends to offer under Rule 404(b), as well as a brief statement of the grounds of its admissibility, well in advance of trial, and we will also provide sufficient time for any motions by defendants for exclusion of such evidence.[28] A specific order will be set when the trial date is set.

---

**27.** The Government also informs the Court that "much of the evidence concerning the defendants' prior criminal conduct is direct proof of the racketeering enterprise," and, therefore, will not be introduced under Rule 404(b). Gov't Opp. at 107. The Government correctly notes that, in racketeering cases, it "may introduce evidence of uncharged criminal acts in order to establish the existence of the criminal enterprise charged in the Indictment." *Id.; see, e.g., United States v. Brady*, 26 F.3d 282, 287 (2nd Cir.1994); *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992). Therefore, the present discussion only

applies to evidence that the Government intends to introduce solely pursuant to Rule 404(b).

**28.** While we decline to mandate the exact format of this document, it must be "sufficiently clear to permit pretrial resolution of the issue of its admissibility." 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 404.23(1) (Joseph M. MchLaughlin, ed., Matthew Bender 2d ed.1997)

### 4. United States Attorneys' Manual "Death Penalty Protocol"

Finally, Xavier Williams requests certain discovery pursuant to the Department of Justice's Death Penalty Protocol, USAM § 9–10.000 et seq. The Protocol "sets forth policy and procedures to be followed in all Federal cases in which a defendant is charged with an offense subject to the death penalty, regardless of whether the United States Attorney intends to request authorization to seek the death penalty." [29] *Id.* § 9–10.010. As the three Williams defendants have been charged with offenses whose maximum punishment is the death penalty, the Protocol, by its terms, is applicable to this case. Section 9–10.030 of the Protocol states: "At the time an indictment charging a defendant with an offense subject to the death penalty is filed ... the United States Attorney should give counsel for the defendant a reasonable opportunity to present any facts, including any mitigating factors, to the United States Attorney for consideration." Xavier Williams argues that in order for him to have a "reasonable opportunity" to present facts and reasons why the United States Attorney should not seek the death penalty, he must be given access to certain information in the Government's possession. X.W. Mem. at 50–57.

Regardless of the merits of Xavier Williams's interpretation of "reasonable opportunity," logic requires that we first consider his assertion that the Protocol establishes a protected interest in death-eligible defendants. The vast majority of courts to consider this question have held that the Protocol does not create any such legally enforceable rights, and that, therefore, they lack the power to order the Government to abide by it. *United States v. Fernandez,* 231 F.3d 1240, 1246 (9th Cir.2000); *United States v. Feliciano,* 998 F.Supp. 166, 169 (D.Conn.1998); *United States v. McVeigh,* 944 F.Supp. 1478, 1483 (D.Colo.1996); *Nichols v. Reno,* 931 F.Supp. 748, 752 (D.Colo.1996), *aff'd,* 124 F.3d 1376, 1378 (1997); *United States v. Boyd,* 931 F.Supp. 968, 973 (D.R.I.1996); *United States v. Roman,* 931 F.Supp. 960, 964 (D.R.I.1996); *Walker v. Reno,* 925 F.Supp. 124, 129, 131 (N.D.N.Y.1995). *But see United States v. Lee,* 89 F.Supp.2d 1017, 1035 (E.D.Ark.2000); *Walker,* 925 F.Supp. at 132–33 (dictum).

We agree with this weight of authority for two reasons, one founded in text and one in policy.[30] First, the USAM explicitly states that it "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, that are enforceable at law by any party in any matter, civil or criminal ...." *Id.* § 1–1.100. Second, "[t]o hold the policy legally enforceable would be to invite the Attorney General to scrap it, which would hardly be in the public interest." *Ng,* 699 F.2d at 71. Therefore, as the Protocol may not be enforced by a defendant, we deny all of Xavier Williams's motions for discovery founded on such enforcement. *See* X.W. Mem. at 50–57.[31]

---

**29.** For a detailed discussion of the procedures outlined in the Protocol, *see United States v. Shakir,* 113 F.Supp.2d 1182, 1184–85 (M.D.Tenn.2000).

**30.** *See also* our discussion of the *Petite* policy in Section II.H.2, *supra.*

**31.** Xavier Williams, in a last-ditch effort, invokes the All Writs Act as a grounds for the Court to order the discovery he seeks. *Id.* at 39–42. We are unpersuaded that the denial of Xavier Williams motions for extensive discovery will lead to an unfair trial, and, therefore, refuse to invoke the extraordinary All Writs Act here. *Cf.* 244 *Platt v. Minnesota Mining & Mfg. Co.,* 376 U.S. 240, 244, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964) ("Extraordinary writs are 'reserved for really extraordi-

### K. Motion to Hold the Government Prosecutors in Contempt

The discovery package that the Government provided the defendants included, *inter alia*, numerous letters that Xavier Williams had sent to female friends of his, or that they had sent him, while he was housed in the Metropolitan Correctional Center following his arrest. Xavier Williams contends that these letters have no evidentiary value and that the Government's "obvious purpose in including these letters in the discovery package was to make sure that defendant Xavier Williams' wife, co-defendant Kelly Rolon, saw these letters in the hope that that would drive a wedge between defendant Xavier Williams and his wife in these proceedings." X.W. Mem. at 18. He requests that the Court sanction the prosecutors for producing[32] these letters, because, he claims, such production violated his and his correspondents' rights under the First, Fourth, Fifth, and Fourteenth Amendments and the federal Privacy Act.

The Government counters that this motion should be denied because all of the letters produced "have evidentiary value and may be offered as evidence in the Government's case-in-chief or at a penalty phase, or used for impeachment or cross-examination." Gov't Opp. at 112. Furthermore, the Government claims that other "very personal" letters that were seized were not produced, because they lacked evidentiary value. *Id.* As Xavier Williams offers no reason for us to reject the Government's representation, we accept the Government's assertion that it produced only letters with actual evidentiary value.

Moreover, the Court has examined the letters in question and we agree with the Government that they contain information that could be useful in prosecuting this case, impeaching witnesses, or determining a proper sentence. As these letters were provided to the Court under seal, we will not cite specific quotations to support our conclusion. Nevertheless, we will note that the letters include, *inter alia*, names and phone numbers of possible co-conspirators or witnesses, allusions to drug use, and professions of innocence. For these reasons, we refuse to hold the prosecutors in contempt for producing the letters in question. The motion is denied.

### L. Motion for an Order Mandating the Return of Seized Items

When Xavier Williams was arrested in front of the Bronx River Apartments, the police seized jewelry, including a watch, religious beads, and more than $1,300 in cash from his person. He has previously requested the Government to return these items but the Government has refused. Xavier Williams now requests that we order the Government to return these items to him pursuant to Federal Rule of Criminal Procedure 41(e) which provides that "[a] person aggrieved by an unlawful search or seizure or by the deprivation of property may move ... for the return of the property on the ground that such person is entitled to lawful possession of the property."

The Government represents that "the money and jewelry ... is evidence that will be offered at trial" to prove that the defendants were engaged in a lucrative narcotics trafficking business, and that the religious beads will be "offered to corrobo-

---

nary causes.' ") (quoting *Ex Parte Fahey,* 332 U.S. 258, 260, 67 S.Ct. 1558, 91 L.Ed. 2041 (1947)).

**32.** Xavier Williams does not contest the Bureau of Prison's authority to inspect incoming and outgoing prisoner mail, but only the Government's disclosing it to all the defendants, specifically Kelly Rolon. X.W. Mem. at 18.

rate other evidence at trial." Gov't Opp. at 113. Xavier Williams suggests that the Government take photographs of this evidence, and that defendants can stipulate that the photographs are admissible as evidence in place of the original items. X.W. Mem. at 26.

As the Advisory Committee Note to Rule 41(e) states, "[i]f the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable." *See also Podlog v. United States*, 1996 WL 403029, at *1 (S.D.N.Y. July 18, 1996) (quoting this language). Since the Government does intend to use this evidence at trial, we decline to order it to use photographs or stipulations in place of the authentic materials it seized. The Government is entitled, subject to very narrow exceptions not applicable here, "to prove its case free from any defendant's option to stipulate the evidence away." *Old Chief v. United States*, 519 U.S. 172, 189, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). The motion is, therefore, denied.

### M. Michael Williams's Motion for Severance

Michael Williams asserts that his trial should be severed from that of the other defendants because " 'acceptance of one party's defense would tend to preclude the acquittal of [the] other.' " M.W. Mem. at 15 (quoting *United States v. Salameh*, 152 F.3d 88, 116–17 (2d Cir.1998)). Michael Williams offers no explanation whatsoever for this assertion, and we are aware of none.

■ In general, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). "This preference is particularly strong where ... the defendants are alleged to have participated in a common plan or scheme." *Salameh*, 152 F.3d at 115. Here, Michael Williams is charged with, *inter alia*, racketeering, narcotics conspiracy, and money laundering conspiracy, all in consort with co-defendants Elijah Bobby Williams and Xavier Williams.

In sum, Michael Williams has offered no reason, apart from a single unexplained quotation from *Salameh*, to sever his trial. Thus, given the strong preference for a joint trial in a case like this and the absence of a persuasive reason to depart from that preference, we deny his motion.

### N. Kelly Rolon's Motion for Severance

Kelly Rolon was charged, together with the other three defendants, with a single count of narcotics conspiracy. She is not named in any of the other sixteen counts of the indictment. She moves for severance, under Federal Rule of Criminal Procedure 14, on the ground that she would be prejudiced by a joint trial. For the reasons that follow, we grant her motion.

■ As noted above, when defendants are charged with a common plan or scheme, there is a strong preference for trying them together in a single trial. *See* Section II.M, *supra*, and cases cited therein. *See*. Nevertheless, if the defendant can show that "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," the district court may order separate trials. *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933. For several reasons, we find that Ms. Rolon's trial should be severed from that of the Williams defendants and, accordingly, order separate trials.

■ First, we are concerned that Ms. Rolon would suffer "spillover prejudice" in a joint trial. Such prejudice occurs "when proof inadmissible against a

defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper." *Salameh,* 152 F.3d at 115. On the other hand, a "defendant's claim that he was prejudiced by the admission of evidence at a joint conspiracy trial is insupportable when the evidence would have been admissible against him in a separate trial alone as a member of the conspiracy." *Id.*

Thus, we must make a preliminary determination whether the evidence the Government will introduce against Ms. Rolon's co-defendants would also be admissible against her, even if she were granted a separate trial.[33] The present indictment includes both RICO counts and non-RICO counts. Ms. Rolon is not charged in any RICO counts, however. At trial, the Government will be permitted to introduce "evidence of criminal activities in which a defendant did not participate to prove the enterprise element" of the RICO counts. *United States v. Tellier,* 83 F.3d 578, 582 (2d Cir.1996). Here, while these activities include narcotics trafficking in which the Government alleges that Ms. Rolon was directly engaged, the Government will likely also introduce evidence of murders and attempted murders with which Ms. Rolon is not charged and, moreover, would likely not be admissible against her if her trial were severed.

The Government counters with the argument that since the acts of violence charged in the RICO count were carried out in furtherance not only of the RICO enterprise, but also of the narcotics conspiracy, proof of murder and attempted murder would be admissible against Ms. Rolon as overt acts in furtherance of the conspiracy. Government's Memorandum of Law in Opposition to Defendants' Pretrial Motions ("Gov't Opp.") at 92. Even assuming, *arguendo,* that the Government is correct in this assertion, while proof of the violent acts themselves may be admissible, evidence of the details of those acts, such as grisly photos of the crime scene or the victims, would likely not be admissible to prove the narcotics conspiracy. *See* Fed.R.Evid. 403. Thus, it appears that there is a significant risk that powerful evidence that would not be admissible against Ms. Rolon will be introduced in a joint trial against her co-defendants, and, consequently, a real risk of spillover prejudice.

Moreover, the inclusion of death penalty-eligible counts against all three of Ms. Rolon's co-defendant's, but not against her, counsel in favor of severance.[34] *See, e.g., United States v. Bin Laden,* 109 F.Supp.2d 211, 222 (S.D.N.Y.2000) (noting the holdings in *Rollack* and *Maisonet* that the presence of both death-eligible and death-ineligible defendants " 'tips the balance' in favor of severance"); *United States v. Rollack,* 64 F.Supp.2d 255, 257 (S.D.N.Y. 1999); *United States v. Maisonet,* 1998 WL 355414, at *4 (S.D.N.Y. July 1, 1998).

While the Government requests that we wait until it decides whether it will seek the death penalty to decide whether to grant Ms. Rolon's motion for severance, a substantial amount of time has already passed and still remains for the decision

---

**33.** We refer to this as a "preliminary" determination because we are merely attempting to predict what evidence the Government will introduce at trial, and against whom it may be admitted. This discussion is not a final ruling on the merits of any evidentiary issues that may arise during trial.

**34.** We are well aware that the trial of a non-capital defendant before a death-qualified jury does not, in and of itself, work a constitutional violation. *Buchanan v. Kentucky,* 483 U.S. 402, 420, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). Nevertheless, we are free to consider this fact in deciding whether to order a severance. *See* cases cited following this note.

making process to conclude. Gov't Opp. at 86 n. 18. Thus, the "participation of the death-eligible defendants in the case [ ] may cause the case to proceed on two different tracks" and judicial economy may not be best served by conducting a joint trial in this case. *Maisonet* 1998 WL 355414, at *4. Furthermore, a joint trial would almost certainly mean that Ms. Rolon's pre-trial detention will be lengthened considerably.

Thus, because of the danger of spillover prejudice, and because of the inclusion of death-eligible counts against her co-defendants, we find that Ms. Rolon will be prejudiced by a joint trial. As we do not believe a limiting instruction to the jury will suffice to remove this prejudice, we hereby grant Ms. Rolon's motion for severance under Rule 14 of the Federal Rules of Evidence. Furthermore, we hereby schedule a conference in anticipation of the trial of Ms. Rolon for December 17, 2001 at 12:00 p.m. The Williams defendants need not attend.

### III. CONCLUSION

All of the defendants' pretrial motions are denied, except as follows:

- Kelly Rolon's motion for severance is granted. A conference will be held to schedule her trial on December 20, 2001 at 10:00 a.m.
- Michael Williams's motion to suppress a post-arrest statement he made on March 22, 1996 is granted.
- Xavier and Michael Williams's motions to compel certain discovery is granted in part and denied in part, as elaborated in Section II.J, *supra.*

IT IS SO ORDERED.