**UNITED STATES of America,**

v.

**Nicholas Michael GRUTTADAURIA, also known as "Beaver" and "Nicky G," Ronald Pecoraro, also known as "Ronald Russo" and "Frank Pecoraro," Joseph Rutigliano, also known as "Joe Box" and "Joe New York," David Gross, Kim Brady Land, Mustafa Kahraman, also known as "Mike", Nedim Sirin, Metin Sap, Michael Costigliola, John Cavallo, also known as** "Jack", Giovanni Vella, also known as "John Vella" and "Mousey," Birol Mete, also known as "Billy Boy," Mecit Sahin, also known as "John," Salvatore Rubino and Salvatore Cesarino, Defendants.

No. 05–CR–717(ADS)(WDW).

United States District Court, E.D. New York.

July 21, 2006.

Roslynn R. Mauskopf, United States Attorney, Eastern District of New York by James M. Miskiewicz, Assistant United States Attorney, Central Islip, NY, for U.S.

Law Offices of Glenn A. Obedin by Glenn A. Obedin, Esq., Central Islip, NY, for the defendant Nicholas Michael Gruttadauria.

Alan M. Nelson, Esq., Lake Success, NY, for the defendant Ronald Pecoraro.

Jerome A. Scharoff, Esq., Leonard R. Sperber, Esq., Garden City, NY, Co-counsel for the defendant Joseph Rutigliano.

John F. Carman, Esq., Garden City, NY, for the defendant David Gross.

Law Offices of Robert C. Gottlieb by Robert Curtis Gottlieb, Esq., Commack, NY, for the defendant Kim Brady Land.

Law Office of Peter J. Tomao by Peter J. Tomao, Esq., Garden City, NY, for the defendant John Cavallo.

Law Offices of Thomas F. Liotti by Thomas F. Liotti, Esq., Garden City, NY, for the defendant Giovanni Vella.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This case arose out of an investigation that uncovered numerous illegally operated gambling businesses spread throughout Nassau and Suffolk counties and a money laundering conspiracy involving an elected Judge of the Nassau County District Court. Presently before the Court are various motions by defendants Nicholas Michael Gruttadauria ("Gruttadauria"), Ronald Pecoraro ("Pecoraro"), David Gross ("Gross"), John Cavallo ("Cavallo"), and Giovanni Vella ("Vella"), to dismiss the indictment, suppress evidence, disclose additional evidence, and sever the trials of various counts and defendants.

## I. BACKGROUND

### A. The Indictment

On September 28, 2005, a grand jury returned a six count indictment against fifteen defendants (the "Indictment") on various charges. Count One charges all of the defendants, with the exception of Gross and Kim Brady Land ("Land"), with conspiracy to operate an illegal gambling business, in violation of 18 U.S.C. §§ 371 and 1955. Count Two charges Pecoraro and Joseph Rutigliano ("Rutigliano") with conspiracy to commit extortion in violation of 18 U.S.C. § 1951. Count Three charges Gruttadauria and Gross with conspiracy to receive and dispose of stolen merchandise in violation of 18 U.S.C. §§ 371 and 2351. Count Four charges Gruttadauria, Gross, and Land with a money laundering conspiracy in violation of 18 U.S.C. §§ 1956(h) and 2315. Counts Five and Six charge Pecoraro with illegal possession of a weapon and possession of a defaced weapon in violation of 18 U.S.C. §§ 922(g)(1), 922(k), 924(a)(1)(B), and 924(a)(2).

### B. The Two Conspiracies

According to the affidavits submitted in support of the arrest and search warrants in this case, the government intends to show at trial, through confidential informants, wiretaps, and other evidence, that Gruttadauria has been an associate of the Genovese organized crime family of La Cosa Nostra since 1985, and has used his position as a "soldier" in such organization to direct the two illicit conspiracies alleged in the indictment.

### 1. The Alleged Illegal Gambling Conspiracy

The first conspiracy, charged in Count One of the Indictment, alleges that between February 2003 and August 2005, Gruttadauria, along with his partners Rutigliano and Pecoraro, conspired with Cavallo and Vella, among others, to operate a single illegal gambling business on Long Island. This scheme was carried out by organizing and managing illegal gambling sites in separate restaurants and cafes that had back-room establishments, and also locations purporting to be social clubs that cater primarily to the Turkish community.

Although in separate locations, it is alleged that the gambling establishments functioned as a single network supervised by Gruttadauria and under the direction and control of Rutigliano and Pecoraro, who made daily collections totaling approximately $16,000 a week. The government further alleges in Count Two that Rutigliano and Pecoraro committed extortion by unlawfully enforcing their control over the operations of the Turkish gambling clubs against any individuals who sought to replace the machines or contact law enforcement.

One of the social clubs in the illegal gambling scheme was the Delta Seven Club located in West Hempstead, New York, which was allegedly owned by Vella and Cavallo. On January 14, 2004, the Nassau County Police Department ("NCPD") executed a search warrant on the Delta Seven Club and arrested and charged Vella, among others, with promoting gambling, in the second degree, and possession of gambling devices, in the second degree. During the raid Cavallo was present at the club, and was identified by both an undercover NCPD Detective and an FBI Special Agent, both of whom had observed him on previous occasions. According to the Special Agent, Cavallo is known to the FBI to be a long-time associate of Peter Gotti, a former captain and acting boss of the Gambino crime family.

Cavallo's alleged ownership in the Delta Seven Club and his association with the Gambino crime family is an integral part of the government's case. On November 29, 2003, Pecoraro was intercepted negotiating with a confidential informant for assistance with the installation of gambling machines at the Delta Seven Club. In this conversation, Cavallo, who the government alleges is referred to by Pecoraro as "Jack" in the conversation, is reported to be "the main guy" at the Delta Seven Club, and, in an apparent reference to his superior position in the crime family hierarchy, has "a little strength behind 'em too."

### 2. The Money Laundering Conspiracy

The second conspiracy, charged in Counts Three and Four of the indictment, alleges that Gruttadauria, along with Gross, who at the time was an elected Judge of the Nassau County District Court, and Land, who owned a restaurant in Freeport, New York, laundered approximately $130,000 in funds represented to be the proceeds of stolen merchandise. The investigation also revealed that Gruttadauria had an association with Gross, who is referred to on recorded wire taps as "the judge." In one conversation, Gruttadauria spoke to Rutigliano and discussed a meeting he had with "the judge" and a person known to be an acting captain of the Genovese crime family.

This scheme was discovered during the investigation into the gambling conspiracy when an FBI undercover agent approached Gruttadauria for assistance in laundering the proceeds of stolen diamonds. Over the course of several meetings between Gruttadauria and the under-

cover agent, Gruttadauria suggested that the undercover agent launder his funds by opening a gambling club that he could help establish by introducing him to people in New York. On January 27, 2005, the undercover agent met with Gruttadauria, Pecoraro, Gross, and other individuals at the Garden City Hotel in Garden City, New York. During the meeting, the undercover agent mentioned to Gross that he was involved in the diamond business, to which Gross responded that he knew people in that business.

At a subsequent meeting the next day, January 28, 2005, the undercover showed Gruttadauria 19 loose diamonds, and inquired if he knew a buyer for the stolen goods. Gruttadauria noted that "the judge" knew jewelers and suggested to the undercover agent that he contact Gross to come up with a buyer for the diamonds. Later that day, Gross met with the undercover agent, and in his presence made several unsuccessful inquiries over the telephone to sell the diamonds, which he described over the phone as "orphans in need of a new home." After the telephone call, Gross indicated that he was purchasing a restaurant in Freeport, New York, known as "Café by the Sea," and that the sale was documented at a lower price to reduce tax burdens by transferring $200,000 in cash to the seller, who was defendant Land, and indicated that this may present a viable option for laundering the funds once the diamonds were sold.

The next day, January 29, 2005, Gross met with the undercover agent again to further discuss how to launder the proceeds of the stolen diamonds once they were sold. Gross suggested that the undercover agent launder the funds through Gross's 2005 re-election campaign fund account by posing as a political consultant and professional fund raiser. Gross then explained that he would charge a launder-

ing fee that they could negotiate at a later point. However, as the conversation progressed, it was determined that this method would not be feasible because of the public disclosure requirements associated with campaign finance.

As an alternative, Gross suggested that documentation be created to make it appear as though a political party was held at a restaurant. This proposed scheme involved paying the restaurant $10,000 in cash, and then having the restaurant issue checks to various accounts held by the undercover agent as purported payments for fund raising expenses incurred in hosting the event. Gross then proceeded to telephone Land and arrange a meeting later that day to execute the plan.

Later that same day, Gruttadauria, Gross, Land, and the undercover agent met at the Café by the Sea restaurant in Freeport. The four discussed the plan to launder the cash by using the restaurant and Land agreed to the idea for a 16 percent fee. The transaction was completed that night after the diamonds were sold, as follows: The undercover agent gave Land $15,000 in cash in exchange for a false contract and receipt for services rendered by the Café by the Sea and four checks drawn on the restaurant's account totaling $12,600. This amount represented the $15,000 in cash that the undercover agent sought to launder, minus the 16% fee.

On February 25, 2005, the undercover agent met with Gross again at the Garden City Hotel. The undercover agent referred back to the original scheme devised by Gross to launder money through his campaign, and gave him ten checks worth $1,000 each with no payee listed. The undercover hoped to get the "washed" money back, less the fee, after they were deposited. The undercover agent in turn gave Gross $5,000 in cash as an actual

campaign contribution, which was accepted by Gross. At a meeting later that night, Gruttadauria decided that only Land's restaurant will be used to launder funds, instead of Gross's campaign funds. Over the next couple of months until their arrest in August 2005, Gross and Land participated in laundering approximately $110,000 in additional money by using the restaurant, and allegedly paid fees to Gruttadauria for conducting this illicit business. All of these facts are alleged by the government.

## C. The Motions by the Defendants

Presently before the Court are the following motions by Gruttadauria, Pecoraro, Cavallo, Vella, and Gross.

Gruttadauria moves to sever the trial of Counts One, Three, and Four, from Counts Two, Five, and Six.

Pecoraro moves to: (1) suppress evidence obtained by wiretaps; (2) suppress certain property seized during his arrest and the subsequent search of his apartment; (3) suppress certain post-arrest statements;(4) sever the trial of Counts One, Two, Five, and Six, from Counts Three and Four; and (5) bifurcate the trial of Counts Five and Six.

Cavallo moves to (1) dismiss the indictment as insufficient; (2) sever his trial from the trial of the other defendants; or (3) sever the trial of Count One from the remaining counts; and (4) suppress evidence of a pre-trial identification by law enforcement officers as resulting from an illegal arrest and as unduly suggestive.

Vella moves to (1) compel the government to disclose alleged tape-recorded conversations made at the Metropolitan Detention Center ("MDC"); (2) preclude the use of the defendant's 2004 arrest on gambling charges by NCPD; (3) dismiss Count One as insufficient; (4) suppress the defendant's statements; (5) sever his trial from

defendant Gross; and (6) suppress evidence obtained pursuant to a search warrant executed on August 30, 2005.

Gross moves to sever Counts Three and Four from Counts One, Two, Five, and Six.

Where applicable, Cavallo, Vella, Gruttadauria, Pecoraro, and Gross have reserved the right to join in the other defendants' motions.

## II. DISCUSSION

### A. The Motions to Dismiss

#### 1. As to the Sufficiency of the Indictment

The defendants Gruttadauria, Pecoraro, Cavallo, and Vella move to dismiss Count One of the Indictment contending that it does not provide sufficient detail to prepare a defense. Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that an "indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged...." *Id.* "An indictment must sufficiently inform the defendant of the charges against him and provide enough detail so that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. De La Pava,* 268 F.3d 157, 162 (2d Cir. 2001) (citing *United States v. Goodwin,* 141 F.3d 394, 401 (2d Cir.1997)). The indictment must be specific enough to permit a defendant to prepare a defense, thereby conforming to the Sixth Amendment's requirement that a defendant "be informed of the nature and cause of the accusation." U.S. Const. amend. VI; *United States v. Walsh,* 194 F.3d 37, 44 (2d Cir.1999).

An indictment must also set forth the elements of the crime to insure that a defendant is not "convicted on the basis of facts not found by, and perhaps not even

presented to, the grand jury which indicted him." *Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). This can be accomplished by tracking the language of the statute, and if necessary, stating the time and place of the alleged conduct. *See United States v. Flaharty,* 295 F.3d 182, 198 (2d Cir.2002); *United States v. Bagaric,* 706 F.2d 42, 61 (2d Cir.1983).

As for factual allegations, the Second Circuit has "repeatedly refused, in the absence of any showing of prejudice, to dismiss ... charges for lack of specificity." *United States v. McClean,* 528 F.2d 1250, 1257 (2d Cir.1976). Defendants who seeks to challenge the specificity of the indictment must alert the court in detail as to those particular portions that are lacking and explain why greater specificity is required. *United States v. Crowley,* 236 F.3d 104, 106 (2d Cir.2000).

In this case the defendants are charged in Count One with conspiring to operate an illegal gambling business as set forth in 18 U.S.C. § 1955, the statute prohibiting such conduct, and 18 U.S.C. § 371, the general federal conspiracy statute. Section 1955 makes it a crime for five or more persons to conduct, finance, manage, supervise, direct, or own all or part of a gambling business that is both prohibited by state law, and either remains in operation for more than thirty days or has a gross revenue of $2,000 in any single day. *Id.; see Iannelli v. United States,* 420 U.S. 770, 772, 95 S.Ct. 1284, 1287, 43 L.Ed.2d 616 (1975); *see, e.g., United States v. Ruggiero,* 726 F.2d 913, 919–21 (2d Cir.1984), *abrogated on other grounds by Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); *United States v. Russo,* 564 F.2d 2, 3 (2d Cir.1977).

Here, the indictment clearly states all the elements and factual allegations necessary to charge the defendants with con-spiracy to operate an illegal gambling business. The Indictment provides sufficient information for the defendants to prepare a defense by tracking the relevant statutory language and detailing the alleged overt acts that were committed in furtherance of the conspiracy. The Indictment alleges, in relevant part, that between February 2003 and August 29, 2005, the defendants, together with others, "willfully conspired to conduct, finance, manage, supervise, direct and own all or part of an illegal gambling business ... involving the use of electronic gambling devices." Indictment ¶ 1. In addition, the Indictment states that such business was in violation of the New York State Penal Law; involved five or more persons; and remained in continuous operation for a period in excess of thirty days. Indictment ¶ 1. Moreover, the allegations in the indictment not only track the language of the statute, but sufficiently allege each element of the conspiracy and the underlying substantive crime of operating an illegal gambling business.

Cavallo and Vella contend that the indictment improperly combines a number of independent clubs, or separate conspiracies, together in a single conspiracy charge. However, the combining of seemingly independent clubs into a single charge is one way for the government to satisfy the attendant circumstance under § 1955, that is, the requirement that the underlying illegal gambling business be operated by five or more persons. "Such persons indicted for conspiracy might very well be separate and apart from the five or more persons involved in the gambling business itself." *United States v. Bobo,* 477 F.2d 974, 987 (4th Cir.1973). Accordingly, the Court agrees with the government's argument that, although the different clubs may very well have been independent venues or separate conspiracies, if it is proven that the clubs func-

tioned as one illegal interdependent gambling business, the statutory five-person requirement would be satisfied. *Id.,* ("The five persons need make no agreement; all they need to be is involved"); *see, e.g., United States v. Mainello,* 345 F.Supp. 863, 883 (E.D.N.Y.1972).

■ Cavallo also argues that the Indictment is insufficient to allege that he conspired to operate "an illegal gambling business" in that it only charges a single overt act. The Court disagrees. The one overt act naming Cavallo in the Indictment states: "In or about November 2003, the defendants Ronald Pecoraro, John Cavallo and Giovanni Vella met at 115 Woodfield Road, West Hempstead, New York." Indictment ¶ 2(e). In order to prove a conspiracy the government need only show at least one member of the conspiracy performed one overt act in furtherance of the conspiracy. *United States v. Mittal,* No. 98 CR. 1302(JGK), 1999 WL 461293, at *6 (S.D.N.Y. July 7, 1999). In addition, the Court notes that the overt act does not have to be an act which, in and of itself, is criminal or constitutes an objective of the conspiracy. The overt act may be entirely innocent or lawful. *United States v. Provenzano,* 615 F.2d 37 (2d Cir.1980); *United States v. Mitlof,* 165 F.Supp.2d 558, 567 (S.D.N.Y.2001). In sum, the indictment adequately alleges a conspiracy and the motion to dismiss it for insufficiency is denied.

Cavallo further argues that after reviewing the discovery provided by the government that the charge is based on the unsupported assumption that one of the owners of the Delta Seven Club is named "Jack" and that the "Jack" is John Cavallo. This argument is also misplaced. It is well-settled that a federal defendant may not challenge a facially-valid indictment on the ground that it is based on insufficient evidence. *United States v. Williams,* 504

U.S. 36, 54–55, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992); *United States v. Casamento,* 887 F.2d 1141, 1182 (2d Cir. 1989); *U.S. v. Butler* 351 F.Supp.2d 121, 126 (S.D.N.Y.2004).

Accordingly, the motions by the defendants to dismiss the indictment for insufficiency are denied, in all respects.

### 2. The "Petite Policy"

■ Vella argues that the Indictment should be dismissed because it falls within an internal federal government policy, contained in the United States Attorney's Manual § 9–2.031, known as the "Petite policy," named after *Petite v. United States,* 361 U.S. 529, 530, 80 S.Ct. 450, 451, 4 L.Ed.2d 490 (1960) (granting government's motion to remand to dismiss the indictment as contrary to the government's policy against multiple prosecutions based on the same conduct). The Petite policy "is an internal statement by the United States Attorney General setting forth guidelines for federal prosecutors regarding dual and successive federal prosecutions." *United States v. Ng,* 699 F.2d 63, 66 n. 3 (2d Cir.1983).

Vella states that he was arrested by the NCPD for possession of certain gambling equipment on January 14, 2005, and that, pursuant to the Petite policy, this state arrest should shield him from federal prosecution under this Indictment. This argument is without merit. It is well-settled that the Petite "policy affords defendants no substantive rights. It is 'merely an internal guideline for exercise of prosecutorial discretion, not subject to judicial review.'" *United States v. Catino,* 735 F.2d 718, 725 (2d Cir.1984) (quoting *Ng,* 699 F.2d at 71) *accord United States v. Moran,* 349 F.Supp.2d 425, 480 (N.D.N.Y.2005); *see also United States v. Williams,* 181 F.Supp.2d 267, 293 (S.D.N.Y.2001).

Accordingly, the Court denies the motion by Vella to dismiss Count One of the Indictment on the ground of the Petite policy.

## B. The Motions to Suppress Evidence

### 1. As to Defendant Pecoraro

#### i. Evidence Obtained by Wiretaps

■ Pecoraro claims that the evidence obtained through the use of wiretaps in this case must be suppressed because alternative investigative techniques were adequate and available, rendering the use of wiretaps unnecessary. Title III of the Omnibus Crime Control and Safe Street Act, 18 U.S.C. § 2510–2521, "requires that wiretap applications include a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). *United States v. Miller*, 116 F.3d 641, 663 (2d Cir.1997); *United States v. Garcia*, No. 04 CR. 603(HB), 2005 WL 589627, at *4 (S.D.N.Y. Mar. 14, 2005) (citing 18 U.S.C. § 2518(1)(c)); *United States v. Moran*, 349 F.Supp.2d 425, 456 (N.D.N.Y. 2005). Under the Act, the target of the warrant may move to suppress the intercepted communications if the warrant is insufficient on its face. 18 U.S.C. § 2518(10)(a)(iii).

The wiretap application in this case complies with this requirement. The government first applied for an order authorizing the interception and recording of wire or electronic communications on October 3, 2003. In support of the application the government submitted the affidavit of Special Agent Thomas E. Petrouskie of the FBI. In the affidavit, the Special agent detailed for several pages the alternative investigative techniques that had been unsuccessful in achieving all the goals of the investigation, and those that had not been employed because they appeared unlikely to produce results or were too dangerous to implement. *See* Def. Pecoraro Ex. A to the Mtn. Further, the Special Agent stated why the interception of wire communications was necessary to attain certain goals in the investigation.

The techniques utilized prior to the application included the use of confidential sources, pen registers, and physical surveillance. The Special Agent explained that the ability of the confidential sources to further the investigation was limited due to the fact that they did not have a relationship with Gruttadauria and could not overhear all of the conversations between the targets of the investigation. In addition, several confidential sources were identified as not being in a position to testify at the trial without jeopardizing other ongoing criminal investigations or being placed in the witness relocation program for their safety. Further, the affidavit explained how Pecoraro employed a number of different efforts to evade physical surveillance, such as rounding city blocks, executing sudden u-turns, or heading down dead ends only to reverse course.

Other techniques considered, but deemed unlikely to succeed, included the convening of a Federal Grand Jury, interviews of targets, and execution of search warrants. These investigative techniques would all undermine the investigation by prompting the destruction of evidence or the flight of the targets.

Based on a review of the application for the authorization to intercept wire communications, the Court finds that the order substantially complied with the requirements in 18 U.S.C. § 2518(1)(c). Accordingly, the motion by Pecoraro to suppress the wiretap evidence is denied.

## ii. Evidence Obtained from Pecoraro's Residence

Contemporaneous with the arrest of Pecoraro at his residence on August 30, 2005, the government conducted a search of his apartment without a warrant. In the search, the government recovered: (1) a handgun in a dresser drawer; (2) an ammunition magazine in a separate drawer; (3) the sum of $1,200 in cash located behind a separate drawer; (4) the sum of $50,000 in cash concealed in a sock and located in the attic; and (5) various books and other records.

The government contends that the search was conducted after Pecoraro gave his written consent to search the residence on FBI Form FD–302 "Consent to Search." Pecoraro asserts in an affidavit that he did not voluntarily consent to the search. Considering the disputed issues of fact, the Court respectfully refers this motion to suppress the evidence obtained from Pecoraro's residence to United States Magistrate Judge William D. Wall to conduct a suppression hearing and for a report and recommendation as to whether to grant the motion.

## iii. Post–Arrest Statements Uttered by Pecoraro

Following Pecoraro's arrest on August 30, 2005, he made several statements during his arrest in his residence and while he was in custody at the FBI office. Both the defendant and the government seek an evidentiary hearing on this motion. Accordingly, the Court respectfully refers this motion to suppress post-arrest statements uttered by Pecoraro to United States Magistrate Judge William D. Wall to conduct a suppression hearing and for a report and recommendation as to whether to grant the motion.

## 2. As to the Pre–Trial Identification of Defendant Cavallo

Cavallo moves to suppress the pre-trial identification that was made during the search of the Delta Seven Club on January 14, 2005, by the NCPD Detective who alleges that she had previously met Cavallo. Cavallo argues that the identification was the result of an illegal arrest and an unduly suggestive procedure. Considering the disputed issues of fact, the Court respectfully refers this motion to suppress the pretrial identification of Cavallo to United States Magistrate Judge William D. Wall to conduct a suppression hearing and for a report and recommendation as to whether to grant the motion.

## 3. As to Defendant Vella

### i. The Prior Arrest for Gambling

Vella moves to suppress his 2004 arrest for possession of gambling equipment. Vella later plead guilty to disorderly conduct, a violation level offense, and paid a $150 fine. The government contends that this arrest is highly relevant because the facts and circumstances leading to the arrest show that Vella was present in the Delta Seven Club on January 14, 2004, along with gambling machines owned by Pecoraro and Rutigliano.

Vella's prior arrest "is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). However, "such other-crime evidence is admissible for any other relevant purpose, 'such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident,' provided that the probative value of this relevant purpose is not substantially outweighed by any unfair prejudice." *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir.2006) (citations omitted); *see also Huddleston v. United States*, 485 U.S. 681, 691–92, 108 S.Ct. 1496, 99

L.Ed.2d 771 (1988). In light of these principles, the Second Circuit "has long adopted an 'inclusionary' approach to the admission of uncharged crime evidence, under which evidence of prior crimes, wrongs, or acts 'is admissible for any purpose other than to show a defendant's criminal propensity.'" *Paulino,* 445 F.3d at 221 (quoting *United States v. Pitre,* 960 F.2d 1112, 1118–19 (2d Cir.1992)); *see also United States v. Tubol,* 191 F.3d 88, 95 (2d Cir.1999).

Here, the government does not indicate for what purpose the prior arrest would be admitted. As such, the Court finds that the request by the defendant to preclude the use of the arrest is premature. The relevancy and potential unfair prejudice that may result by admitting the prior arrest is better determined in a motion immediately prior to or during the trial. Accordingly, at this time the Court denies, without prejudice, the motion by Vella to preclude his 2004 arrest.

### ii. Evidence Seized at the Delta Seven Club

■ Vella moves to suppress the evidence obtained pursuant to the search warrant issued on August 26, 2005, by the Honorable Joanna Seybert, authorizing the search of the Delta Seven Club. Vella argues that the affidavit in support of the warrant does not contain sufficient detailed information regarding the subject location or the source of the affiant's knowledge to reasonably support a finding of probable cause. Again, the Court disagrees.

Initially, the Court notes that Vella has failed to make any allegation that he had a privacy interest in the Delta Seven Club. In order for an individual to challenge a search or seizure, he must manifest a reasonable expectation of privacy in the location or item searched. *Rakas v. Illinois,*

439 U.S. 128, 134, 99 S.Ct. 421, 425–26 58 L.Ed.2d 387, 394–95 (1978); *United States v. Osorio,* 949 F.2d 38, 40 (2d Cir.1991). The concept of a reasonable expectation of privacy, also known as standing, requires that a defendant seeking to invoke the exclusionary rule show that the alleged illegal conduct infringed on personal constitutional rights. *United States v. Fields,* 113 F.3d 313, 320 (2d Cir.1997). A defendant has the burden of establishing standing by a preponderance of the evidence. *Osorio,* 949 F.2d at 40.

A defendant lacks "standing" when the contact with the searched premises is so attenuated that no expectation of privacy could be considered reasonable. *See Rakas,* 439 U.S. at 137–38, 99 S.Ct. at 427–28. Thus, "[o]ne's privacy interests receive much less protection in public places." *Caldarola v. County of Westchester,* 343 F.3d 570, 575 (2d Cir.2003).

Here, according to the government, Vella was not present during the search of the Delta Seven Club, a public establishment. Vella does not make any allegation showing that the search of the public establishment infringed on his personal constitutional rights. Accordingly, Vella has no standing to suppress the evidence obtained pursuant to the search warrant.

■ Even if Vella did have standing to challenge the search warrant, the motion to suppress would still fail. An evidentiary hearing on a motion to suppress "ordinarily is required if the moving papers are sufficiently definite, specific, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Pena,* 961 F.2d 333, 339 (2d Cir.1992) (citations and quotations omitted). A defendant seeking to suppress evidence bears the burden of showing the existence of disputed issues of ma-

terial fact. *See Pena,* 961 F.2d at 338. Indeed, a district court is not required to hold an evidentiary hearing if the defendant's "moving papers did not state sufficient facts which, if proven, would have required the granting of the relief requested." *United States v. Culotta,* 413 F.2d 1343, 1345 (2d Cir.1969). Further, a court need not hold an evidentiary hearing when the "defendant's allegations are general and conclusory or are based on suspicion and conjecture." *United States v. Wallace,* 1998 WL 401534, *9 (S.D.N.Y. July 17, 1998).

Here, Vella makes conclusory arguments that the affidavit supporting the search warrant is devoid of specific details. However, the affidavit of Special Agent Thomas R. Holmes, which incorporates by reference the affidavit simultaneously submitted in support of the application for an arrest warrant, is extremely detailed. Holmes Aff. in Supp. of Arrest Warrant ¶ 28–44. The affidavits describe how wiretap surveillance captured Vella's participation in the conspiracy, dating back to November 2003. For example, on November 29, 2003, Pecoraro was intercepted negotiating with a Florida resident about installing machines in the Delta Seven Club, and quoted Vella commenting that "I might want to get my own machines." On December 13, 2003, Rutigliano left a voice mail at a phone that answered "John Vella." Rutigliano stated: "Yeah, hi John, Joe Box. Ah, two machines came in. Wanna try and set 'em up and uh deliver 'em by Monday, okay?" Holmes Aff. in Supp. of Arrest Warrant ¶ 32. In addition, the affidavit describes how Vella was arrested in January 2004 by the NCPD and charged with owning illegal gambling machines, and that physical surveillance of the club on August 19, 2005, revealed that the location had resumed gambling activities. Accordingly, the Court finds that the information presented in the affidavits in support of the search warrant was more than sufficient to support the finding of probable cause.

### iii. Post–Arrest Statements Uttered by Vella

Vella also moves to suppress any statements that were made to law enforcement officers that were as a result of the search warrant. Having previously found the search warrant to be lawful, the defendant's motion is denied.

### iv. The Recorded Conversations involving Vella

Without elaborating, in conclusory fashion Vella seeks an order from the Court "compelling the [g]overnment to disclose and produce any and all recorded conversations involving the defendant at the Metropolitan Detention Center or elsewhere." Vella Notice of Mtn. ¶ a. However, as the government points out, there is nothing in any of the numerous pages of affidavits, pleadings, or discovery in this case to support even the inference that any conversations of Vella were ever recorded at the MDC. Accordingly, the motion is denied.

### C. The Motions to Sever

#### 1. Rule 8

■ Where, as here, defendants in a multi-defendant case challenge joinder of offenses and defendants, the motion is construed as arising under Rule 8(b). *See United States v. Turoff,* 853 F.2d 1037, 1043 (2d Cir.1988). It is well-settled that Rule 8(b) governs the joinder of two or more defendants in the same indictment. *United States v. Feyrer,* 333 F.3d 110, 113 (2d Cir.2003). Rule 8(b) states:

The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series

of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed.R.Crim.P. 8(b).

The effect of analyzing joinder of multiple defendants and counts under Rule 8(b), rather than 8(a), ensures that multiple defendants are only tried together if "the charged acts are part of a series of acts or transactions constituting an offense or offenses." *Turoff,* 853 F.2d at 1043.

In *United States v. Attanasio,* 870 F.2d 809 (2d Cir.1989), the Second Circuit interpreted Rule 8(b) to mean that the acts must be "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." *Id.* at 815 (citing *United States v. Porter,* 821 F.2d 968, 972 (4th Cir.1987)). Within this framework, the Second Circuit has noted that it uses "a common sense approach when considering the propriety of joinder under Rule 8(b)." *United States v. Feyrer,* 333 F.3d 110, 114 (2d Cir.2003).

Here, it is apparent that the gambling conspiracy is not related to the money laundering conspiracy by facts or participants. The only defendant that is charged with both conspiracies is Gruttadauria, who is alleged to have been the ringleader of both schemes. "[D]efendants charged with two separate—albeit similar—conspiracies having one common participant are not, without more, properly joined." *United States v. Giraldo,* 859 F.Supp. 52, 55 (E.D.N.Y.1994) (quoting *United States v. Welch,* 656 F.2d 1039, 1049 (5th Cir. 1981)). Further, the mere presence of Rutigliano—a participant in the gambling conspiracy—at the meetings that preceded the money laundering conspiracy, without more, is insufficient to constitute a substantial identity of participants between the two conspiracies.

In addition, the gambling and money laundering conspiracies do not arise out of the same common plan or scheme. The government argues that the counts are properly joined because the money laundering scheme is an outgrowth of the gambling scheme. In support of this assertion, the government points out that at the beginning of the money laundering conspiracy Gruttadauria suggested to the undercover agent that he should set up a gambling business to help him launder the proceeds of the stolen merchandise. However, this suggestion or reference to the other conspiracy charged in the indictment is insufficient to properly join the two counts under Rule 8(b). In order to be an outgrowth, the second conspiracy must be a product of or as a result of the first conspiracy. Utilizing the common sense approach articulated by the Second Circuit, there is no doubt that the unrelated money laundering scheme was not as a result of the gambling business, but a wholly separate and distinct scheme allegedly devised by Gruttadauria and Gross, and involving different participants. Accordingly, joinder of Counts Three and Four to the remaining Counts in the Indictment is improper, and the motion by the defendants to sever the trials of Counts Three and Four is granted.

As to the motions by the defendants involved in Count One of the Indictment, which charges a conspiracy to operate an illegal gambling business, who seek severance pursuant to Rule 8(b) from the other defendants also named in Count One, it is an "established rule" that "a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed.R.Crim.P. 8(b)." *United States v. Nerlinger,* 862 F.2d 967, 973 (2d Cir.1988); *see also United States v. Henry,* 861 F.Supp. 1190, 1200 n. 5 (S.D.N.Y.1994) (holding defendants were properly joined "because they are

alleged to have participated in the underlying conspiracy"). Therefore, these motions to sever are denied.

### 2. Rule 14

■ Even if the defendants are properly joined under Rule 8(b), a defendant may move for severance under Rule 14, which provides in relevant part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendant or provide whatever justice requires.

Fed.R.Crim.P. 14.

The thrust of this rule is prejudice in the joinder. Under this Rule, the decision to sever a joint trial "is committed to the sound discretion of the trial judge." *United States v. Blount,* 291 F.3d 201, 209 (2d Cir.2002). There is a preference in the federal system for joint trials of defendants who are indicted together, *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), and the Court should sever trials of co-defendants under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or lack of guilt. *Id.* at 539, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317; *United States v. Rahman,* 189 F.3d 88, 122 (2d Cir.1999). Even if prejudice is shown, Rule 14 does not require severance. *See United States v. Haynes,* 16 F.3d 29, 32 (2d Cir.1994). Rather, "limiting instructions often will suffice to cure any risk of prejudice." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933, 122 L.Ed.2d 317.

"Given the balance struck by Rule 8, which 'authorizes some prejudice' against

the defendant, a defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in 'substantial prejudice.'" *United States v. Amato,* 15 F.3d 230, 237 (2d Cir.1994) (quoting *Turoff,* 853 F.2d at 1043); *see United States v. Cervone,* 907 F.2d 332, 341 (2d Cir.1990).

Severance is not necessary in this case. To the extent that the evidence against one defendant may not relate to another, the Court will either redact or issue limiting instructions to cure any possible prejudice. *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933, 122 L.Ed.2d 317. The Court will give appropriate limiting instructions to the jury, directing the jurors to consider the evidence as to each count of the Indictment and as to each defendant separately, and that a verdict of guilty as to any defendant on any count should not in any way control the jury's verdict as to any other offenses charged. Similarly, to the extent that some of the evidence may not relate to all of the defendants, the Court is still of the opinion that the jury will be able to separately evaluate the evidence, particularly following the limiting instructions. *Id.* Indeed, the Second Circuit has held many times that a multi-defendant trial is not beyond the "ken of the average juror." *United States v. Villegas,* 899 F.2d 1324, 1347 (2d Cir.1990).

Pecoraro argues that the inclusion of Counts Five and Six in the Indictment, which charges him alone with possession of a defaced pistol, requires either severance or a bifurcated trial because that charge requires proof that he committed a prior felony. Generally, such a charge would require a bifurcated trial where evidence of the prior conviction would not otherwise be admissible on the remaining counts. *United States v. Jones,* 16 F.3d 487, 492 (2d Cir.1994). However, in this case Pecoraro's prior conviction was for mail fraud

in a case that involved an illegal gambling operation, in which Gruttadauria was also convicted as a coconspirator. As a consequence, these prior gambling-related convictions may be admissible in this case to prove intent, knowledge, and an absence of mistake regarding the nature of their partnership in running gambling clubs throughout Long Island. *See* Fed.R.Evid. 404(b).

In addition, Pecoraro argues that under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Court is required to bifurcate the trial of a felon in possession charge with regard to the proof of possession of a firearm and proof of the prior felony. However, this argument has specifically been rejected by the Second Circuit. *See United States v. Belk,* 346 F.3d 305, 307 (2d Cir.2003). Accordingly, a bifurcated trial is not necessary in this case.

In sum, the Court finds that the defendants Gruttadauria, Pecoraro, Cavallo, and Vella have not demonstrated the existence of a serious risk that a joint trial will compromise a specific trial right or will prevent the jury from making a reliable judgment about guilt or lack of guilt. *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933, 122 L.Ed.2d 317; *Rahman,* 189 F.3d at 122. Accordingly, their request for severance pursuant to Rule 14 is denied.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the defendants motions to dismiss the Indictment as to insufficiency are DENIED, and it is further;

**ORDERED,** that the motion by Pecoraro to suppress the wiretap evidence is DENIED; and it is further

**ORDERED,** that the motion by Pecoraro to suppress the evidence obtained from his residence is respectfully referred to United States Magistrate Judge William D. Wall to conduct a suppression hearing and for a report and recommendation on whether to grant the motion; and it is further

**ORDERED,** that the motion by Pecoraro to suppress his post-arrest statements is respectfully referred to United States Magistrate Judge William D. Wall to conduct a suppression hearing and for a report and recommendation on whether to grant the motion; and it is further

**ORDERED,** that the motion by Cavallo to suppress his pre-trial identification is respectfully referred to United States Magistrate Judge William D. Wall to conduct a suppression hearing and for a report and recommendation on whether to grant the motion; and it is further

**ORDERED,** that the motion by Vella to suppress evidence of his 2004 arrest is DENIED, without prejudice, with leave to renew prior to or during the trial; and it is further

**ORDERED,** that the motion by Vella to suppress evidence obtained pursuant to the search warrant is DENIED; and it is further

**ORDERED,** that the motion by Vella to suppress his post-arrest statements is DENIED; and it is further

**ORDERED,** that the motion by Vella to compel the government to disclose and produce any conversations involving him that were recorded at the MDC is DENIED; and it is further;

**ORDERED,** that the motion by the defendants pursuant to Rule 8(b) to sever the trials of Counts Three and Four from the remaining counts in the Indictment is GRANTED; and it is further

**ORDERED,** that the remaining motions by the defendants to sever are all DENIED; and it is further

**ORDERED,** that the motion by Pecoraro to bifurcate the trials of Counts Five and Six is DENIED.

**SO ORDERED.**